UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x
                              :
IN RE DIGITAL MUSIC           :
ANTITRUST LITIGATION          :        MDL No. 1780 (LAP)
                              :
THIS DOCUMENT RELATES TO:     :        OPINION AND ORDER
ALL ACTIONS                   :
                              :
------------------------------x

LORETTA A. PRESKA, U.S.D.J.

    This multidistrict litigation involves allegations that
Sony BMG Music Entertainment, Sony Corporation of America,
Bertelsmann Music Group, Inc., Bertelsmann, Inc., Universal
Music Group, Inc., Time Warner Inc., Warner Music Group Corp.,
and EMI Music North America (collectively, the "Defendants")
conspired artificially to fix or maintain the prices of digital
music recordings offered for sale on the internet in violation
of Section 1 of the Sherman Act, 15 U.S.C. § 1, various states'
antitrust and consumer protection statutes, and/or state common
law, such as unjust enrichment.[1]  Over 30 actions (the "Digital
Music actions") have now been transferred and consolidated
before the Court for pre-trial proceedings (collectively, the
"Consolidated Action").  Proposed Interim Co-Lead Counsel, on

---

[1] A Consolidated Class Action Complaint has not been filed yet,
thus, the Court refers to the summary of common allegations set
forth by the Judicial Panel on Multidistrict Litigation in In re
Digital Music Antitrust Litigation, 444 F. Supp. 2d 1351, 1352
(J.P.M.L. 2006).

behalf of all Plaintiffs and the proposed Class(es) in the Consolidated Action, now move for recusal under 28 U.S.C. § 455(a) and (b)(4).  For the reasons set forth below, the motion is denied.


BACKGROUND

1.   Recusal Issue Raised In The *Seley*, *Devine*, *Corkery*, And *Zedek* Actions

The Court was involved in this multidistrict litigation from the outset.  On March 9, 2006, the first Digital Music action filed in this District was assigned to this Court.  See Seley v. Universal Music Group, Inc., No. 06 Civ. 1887 (LAP) (S.D.N.Y.) ("Seley").  Counsel in Seley was Christopher Lovell, Esq., of Lovell Stewart Halebian LLP ("Lovell Stewart").

On June 6, 2006, Mr. Lovell, on behalf of named plaintiff Mark Devine, filed Devine v. Universal Music Group, Inc., No. 06 Civ. 4211 (LAP) (S.D.N.Y.) ("Devine").[2]  Shortly thereafter, on

---

[2] The following Digital Music actions were also assigned to this Court upon their commencement: Corkery v. Bertelsmann, Inc., No. 06 Civ. 2732 (LAP) (S.D.N.Y.) ("Corkery") (Compl. filed Apr. 7, 2006) and Zedek v. Bertelsmann, Inc., No. 06 Civ. 3086 (LAP) (S.D.N.Y.) ("Zedek") (Compl. filed Apr. 21, 2006).  Three other Digital Music actions filed in this District were originally assigned to former Chief Judge Michael B. Mukasey and then reassigned to this Court: Ewing v. Sony BMG Music Entm't, No. 06 Civ. 2355 (MBM) (S.D.N.Y.) (Compl. filed Mar. 24, 2006), Candler v. Sony BMG Music Entm't, No. 06 Civ. 2610 (MBM) (S.D.N.Y.) (Compl. filed Apr. 3, 2006), and Randall v. Sony BMG Music Entm't, No. 06 Civ. 5602 (MBM) (S.D.N.Y.) (Compl. filed July 25, 2006).

June 12, 2006, the Court issued the following Memorandum (the

"Memorandum") in <u>Devine</u>:

> The parties are informed that the law firm in which my
> husband is a partner, Cahill Gordon & Reindel LLP,
> from time to time represents Sony BMG Music
> Entertainment and Warner Music Group Corp., and he has
> worked on those matters.  The firm has also
> represented Universal Music Group, and he has worked
> on those matters.

(Dkt. No. 2).[3]

On July 3, 2006, Mr. Lovell wrote the Court to raise the

recusal issue.  (<u>See</u> Consolidated Action, Dkt. No. 40, Ex. 1 at

1 ("I respectfully draw Your Honor's attention to the following

matters that Your Honor may consider relevant under 28 U.S.C.

§ 455(a).") (the "July 3, 2006 Letter")).  Mr. Lovell asserted

that there is a relationship between the alleged digital music

conspiracy in the <u>Devine</u> action and the alleged compact disc

music conspiracy in <u>In re Compact Disc Minimum Advertised Price</u>

<u>Antitrust Litigation</u>, MDL No. 1361 (D. Me.) ("<u>Maine CD MDL</u>").

(<u>Id.</u> at 1-2).  Mr. Lovell asserted further that Defendants in

both actions overlapped and that my husband, Thomas J. Kavaler,

Esq., represented several Defendants in the <u>Maine CD MDL</u>.  (<u>Id.</u>

at 2).  Finally, Mr. Lovell stated that "[P]laintiffs [in the

---

[3] It is the Court's practice to review cases at or about the time
they are assigned and to place on the Court's docket a
memorandum bringing to the parties' attention facts which,
although not requiring recusal, disclose some relationship with
a lawyer or a party.  The Memorandum was also placed on the
docket in the <u>Corkery</u> action on April 20, 2006.  (Dkt. No. 3).

<u>Devine</u> action] will be taking positions contrary to the positions taken by the [D]efendants in [the <u>Maine CD MDL</u>] with respect to an entire gamut of legal, procedural, factual, and antitrust conspiracy issues" and that "[t]he evidence from the [<u>Maine CD MDL</u>] in which [my husband] represented the [D]efendants may be melded with or added to the great bulk of the evidence which will concern the time period and on-line context at issue in this case." (<u>Id.</u>).

On July 24, 2006, the Court issued an Order (the "July 24, 2006 Order") in the <u>Seley</u>, <u>Devine</u>, <u>Corkery</u>, and <u>Zedek</u> actions informing the parties that it was in receipt of Mr. Lovell's July 3, 2006 Letter. (<u>See, e.g.</u>, <u>Seley</u>, Dkt. No. 10). The Order recited the following information: (i) Cahill Gordon & Reindel LLP ("Cahill Gordon") had not been retained in those Digital Music actions; (ii) a conference would be held by the Court on July 26, 2006 "relating to possible overlap between [the <u>Seley</u>, <u>Devine</u>, <u>Corkery</u>, and <u>Zedek</u>] actions and [the <u>Maine CD MDL</u>];" and (iii) "any party wishing to be heard on that issue [may] appear." (<u>Id.</u>).[4]

On July 26, 2006, the Court held the aforementioned conference. At that conference, Defendants provided details of Cahill Gordon's and my husband's representation of Defendants,

---

[4] The Court also instructed Mr. Lovell to fax the Order "promptly to counsel and/or parties served." (<u>Id.</u>).

including their roles in the representation of Sony Music
Entertainment in In re Compact Disc Litigation, MDL No. 1216
(C.D. Cal.) ("California CD MDL"), Ottinger v. EMI Music
Distributors, No. 24865-II (Tenn. Cir. Ct., Cocke Cty.)
("Ottinger"), and the Maine CD MDL.  Based on these disclosures,
the fact that neither my husband nor Cahill Gordon was
representing any Defendant in the Seley, Devine, Corkery, and
Zedek actions pending before me, and on the fact that, following
my inquiry at the conference, no Plaintiff in those Digital
Music actions sought recusal, I concluded at the conference that
no further action on this issue was warranted.  (See Seley, Dkt.
No. 12 ("At the conference held on July 26, attended by counsel
for [P]laintiffs and counsel for several [D]efendants, the
parties informed the court that no party sought recusal.
Accordingly, no further action will be taken with respect to Mr.
Lovell's July 3 letter.")).


2.   Recusal Issue Not Raised Before The JPML

     On or about March 30, 2006, Plaintiffs in the Seley action
and Defendants separately moved the Judicial Panel on
Multidistrict Litigation ("JPML") for an order centralizing all
the then-pending Digital Music actions in the Southern District
of New York.  In re Digital Music Antitrust Litig., 444 F. Supp.
2d 1351, 1352 (J.P.M.L. 2006).  "No party oppose[d]

centralization." Id.  However, "Plaintiffs in various [Digital Music] actions support[ed] transfer to the Northern District of California." Id.[5]  The JPML heard oral argument on the motions to transfer on July 27, 2006.

It does not appear that the recusal issue was raised with, or considered by, the JPML, and no party has suggested otherwise.  Id. ("We are persuaded that the Southern District of New York is an appropriate transferee forum for this litigation. Most defendants are headquartered in the Southern District of New York, and some relevant witnesses and documents may be located there.  Moreover, this district enjoys the support of the [D]efendants as well as some [P]laintiffs in this litigation.").  On August 16, 2006, the JPML transferred the then-pending Digital Music actions to this Court in the Southern District of New York for coordinated or consolidated pre-trial proceedings pursuant to 28 U.S.C. § 1407.  Id.

3.   Recusal Issue Not Raised At The Initial Pre-Trial
     Conference In The Consolidated Action

On November 17, 2006, the Court held an initial pre-trial conference in the Consolidated Action.  In advance of that

---

[5] The JPML noted that this group included Plaintiffs in two Northern District of California actions, one of which, according to the Digital Music actions listed by the JPML on "Schedule A" of its decision (see id. at 1352-53), was Bulcao v. Sony BMG Music Entertainment, No. 3:06-1752 (N.D. Cal.) ("Bulcao").

conference, the Court ordered the parties to meet and confer on a proposed agenda. (Dkt. No. 8 ("Counsel shall appear for the initial pretrial conference . . . . Counsel shall confer among themselves and inform the Court by letter . . . how they propose to proceed.")). The parties did so. (Dkt. No. 56 at 1, n.1 (Letter from Kenneth R. Logan, Esq., with the consent of Plaintiffs and Defendants, to the Court, dated November 10, 2006: stating that "[c]ounsel for Plaintiffs in various actions transferred to this Court participated in the [meet and confer] conference" and that "the parties agree that this list [of issues discussed] presents an appropriate agenda for discussion at the Initial Pretrial Conference")). The issue of recusal was not included. (Id. passim).

At the conference, Mr. Lovell appeared among other attorneys for Plaintiffs, including Bonny E. Sweeny, Esq., and Christopher M. Burke, Esq., of Lerach Coughlin Stoia Geller Rudman & Robbins LLP ("Lerach Coughlin"), and spoke on behalf of all Plaintiffs with respect to some of the items on the agenda. One item was the proposed organization of Plaintiffs' counsel. (Id. at 1). Another item was the filing of the initial Consolidated Class Action Complaint. (Id. at 2). Before filing this pleading, Plaintiffs sought discovery of information already provided by Defendants to law enforcement agencies in connection with those agencies' investigations relating to the

7

distribution of digital music.  (Id. at 3).  The Court denied
that request without prejudice to Plaintiffs' seeking such
discovery after filing their Consolidated Class Action Complaint
and before their time to file an Amended Consolidated Class
Action Complaint.  (Dkt. No. 28 at 2 ("Defendants have no
present obligation to produce documents in this litigation.")).


4.   Recusal Issue Raised For The First Time In The Consolidated
     Action One Month After The Initial Pre-Trial Conference

     On November 17, 2006, after the initial pre-trial
conference, the Memorandum was placed on the docket in the
Consolidated Action.  (Dkt. No. 18).  On December 4, 2006, the
parties submitted a proposed Order which set forth, inter alia,
the following deadlines: (i) Plaintiffs' time to file their
motion for appointment of Lead Counsel or Co-Lead Counsel;
(ii) Plaintiffs' time to file the Consolidated Class Action
Complaint; (iii) Defendants' time to respond to the Consolidated
Class Action Complaint; (iv) Plaintiffs' time to file an Amended
Consolidated Class Action Complaint; and (v) the time for the
parties to meet and confer regarding discovery.  The Court
entered that Order on December 5, 2006.  (Dkt. No. 28).

     That same day, Lerach Coughlin attorneys (including John J.
Stoia, Jr., Esq., Ms. Sweeney, and Mr. Burke) and Lovell Stewart
attorneys (including Mr. Lovell) filed Plaintiffs' Motion for

Appointment of Interim Co-Lead Counsel, Steering Committee and
Plaintiffs' Foreign Liaison Counsel, their Memorandum of Law in
support thereof, and their proposed Appointment Order
(collectively, the "Class Counsel Motion").  (Dkt. Nos. 24-25).
The Motion seeks, inter alia, to have the Lerach Coughlin and
Lovell Stewart law firms appointed as Interim Co-Lead Counsel in
the Consolidated Action.  (See Memorandum of Law in Support of
Motion for Appointment of Interim Co-Lead Counsel, Steering
Committee and Plaintiffs' Foreign Liaison Counsel ("Class
Counsel Mem."), filed on December 5, 2006, at 8-14).

     More than one month after the initial pre-trial conference,
on December 20, 2006, Messrs. Stoia and Lovell, in their
capacity as proposed Interim Co-Lead Counsel on behalf of all
Plaintiffs and the proposed Class(es), requested a pre-motion
conference.  (Dkt. No. 39 (the "December 20, 2006 Letter")).
Messrs. Stoia and Lovell stated that "the parties and the Court
need additional information concerning the scope and substance
of Mr. Kavaler's and Cahill Gordon's former and/or current
representation of [Sony BMG Music Entertainment, Warner Bros.
Records, Inc. and UMG Recordings]."  (Id. at 1).

     The December 20, 2006 Letter identified only two areas
which, according to Messrs. Stoia and Lovell, "bear[] directly
on the issue of recusal under 28 U.S.C. § 455" and where
additional information "will allow all concerned to make an

informed judgment in that regard." (Id. at 3).  First, Messrs.
Stoia and Lovell stated that "there is a significant likelihood
of overlap and interplay between th[e] [Consolidated Action] and
[the California CD MDL], where Mr. Kavaler and Cahill Gordon
represented Sony Music Entertainment, and [Ottinger], a
companion state action where Cahill Gordon represented Sony
Music Entertainment." (Id. at 1).  According to Messrs. Stoia
and Lovell, "while [P]laintiffs do not believe that the releases
in Ottinger or the [California CD MDL] bar claims or limit
damages in th[e] [Consolidated Action], the issue is likely to
be contested through motion practice and discovery into the
facts surrounding the negotiation of the releases (including
communications between the parties and their counsel) obtained
in the [California CD MDL] and Ottinger." (Id. at 2).[6]  (The
issue of the scope of the releases in the California CD MDL,
Ottinger, and the Maine CD MDL is referred to herein as the
"Release Issue.")

    Second, Messrs. Stoia and Lovell stated that, "[b]ased upon
press reports . . . [t]he New York Attorney General and the
Department of Justice Antitrust Division are investigating

---

[6] Messrs. Stoia and Lovell stated that the basis for their belief
that this issue will be raised here is that Defendants asserted
this position during the briefing on the motions for transfer
and coordination or consolidation before the JPML. (Id. at 2
(citing "defendants' joint reply for transfer")).

whether [D]efendants have restrained trade in the market for digital downloads and the Department of Justice's San Francisco field office is investigating whether certain of the [D]efendants misled the Department of Justice concerning the formation of the digital music joint ventures known as MusicNet and pressplay." (Id. at 3). Messrs. Stoia and Lovell conceded that they "do not know whether Mr. Kavaler and/or Cahill Gordon have been consulted by or are representing one or more of the [D]efendants in these governmental investigations . . . ." (Id.). (The issue of the prior or ongoing law enforcement investigations into the distribution of digital music is referred to herein as the "Governmental Investigation Issue.")

On January 12, 2007, Defendants responded to the December 20, 2006 Letter contending that the Consolidated Action should proceed because the issue of recusal is untimely and, in any event, meritless. (Dkt. No. 26 at 1 (Letter from Mr. Logan to the Court) (the "January 12, 2007 Letter")). With respect to timeliness, Defendants asserted that the issue of recusal was previously raised and resolved at the July 26, 2006 conference in the Seley, Devine, Corkery, and Zedek actions, "which was prompted by a letter from Mr. Lovell . . . and held with notice provided by both the Court and by Mr. Lovell's firm to all parties wishing to be heard on the issue." (Id. at 2). Defendants further asserted that "Plaintiffs never suggested

that recusal should be included on the Court's agenda" for the
November 17, 2006 initial pre-trial conference.  According to
Defendants, "the parties (again, including Lovell Stewart) met
and conferred on an agenda of items to discuss with the Court at
the initial case management conference" and that "Plaintiffs
were aware of Mr. Kavaler's representation of certain
Defendants, and knew from Defendants' submissions to the [JPML]
that Defendants may claim that the <u>Ottinger</u> settlement bars
certain of Plaintiffs' claims" in the Consolidated Action.
(<u>Id.</u>).

     With respect to the Release Issue, Defendants also relied
on the July 26, 2006 conference.  (<u>Id.</u>).  As noted above, after
Defendants described Cahill Gordon's and my husband's
representation of certain Defendants in prior cases, including
their roles in the representation of Sony Music Entertainment in
the <u>California CD MDL</u>, <u>Ottinger</u>, and the <u>Maine CD MDL</u>, the Court
concluded that the Release Issue (or any other issue) did not
warrant further action, and Plaintiffs in those Digital Music
actions did not move for recusal based on the Release Issue (or
any other issue).  (<u>Id.</u>).  With respect to the Governmental
Investigation Issue, Defendants represented that "neither Mr.
Kavaler nor Cahill Gordon has been consulted, has represented,
or does represent any Defendant, in any investigation pending by
the New York Attorney General, the Department of Justice

Antitrust Division, or the Department of Justice's San Francisco office." (Id. at 4).[7]

On January 18, 2007, Defendants submitted my husband's affidavit (the "Kavaler Affidavit") "to set forth certain facts with regard to [Cahill Gordon's] representation of certain entities during 2006." (Kavaler Aff. ¶ 2).[8] During 2006, Cahill Gordon logged fewer than 30 hours, out of a total of 200 hours chargeable to Sony BMG Music Entertainment, on the California CD MDL, Ottinger, and the Maine CD MDL. (Id. ¶ 3(A)).  My husband explained the reason for the extremely low number of hours charged to these cases as follows:

> The litigated matters in each of these cases have been resolved.  The sole remaining question in the [Maine CD MDL] relates to final adjustments of a cy pres distribution in which [Sony BMG Music Entertainment] has no interest.  The [California CD MDL] has been

---

[7] Defendants also provided a summary description of the cases identified by Messrs. Stoia and Lovell where my husband or Cahill Gordon represented them.  (Id. at 2-3).  According to Defendants, my husband's "representation of [them] in matters merely touching on the music industry has such an attenuated connection to the issues in this matter as to have no relevance at all to an analysis under Section 455(a)."  (Id. at 3).  With respect to Cahill Gordon, "Defendants note[d] that th[e] cases [identified by Messrs. Stoia and Lovell] have no connection to the issues in this litigation and either do not involve Mr. Kavaler or a Defendant in this action."  (Id.).  Messrs. Stoia and Lovell failed to address these assertions in their reply submission, thus apparently conceding that cases other than the California CD MDL, Ottinger, and the Maine CD MDL are irrelevant to the issue of recusal.  (Dkt. No. 54 at 3-4).

[8] "Kavaler Aff." refers to the Kavaler Affidavit submitted by Defendants as an attachment to a letter from Georgia K. Winston, Esq., to the Court, dated Jan. 19, 2007.  (Dkt. No. 41).

> dismissed and the only open matter is the final
> distribution of funds held by the mediator/
> administrator of those funds.  The [Ottinger]
> litigation is closed and no open issues remain.

(Id.).  Moreover, my husband averred that he "was not the

partner with day to day involvement in the matters." (Id.).  My

husband further averred that billable hours chargeable to Sony

BMG Music Entertainment represented fewer than approximately

.05% of Cahill Gordon's total hours billed in 2006.  (Id.).

Finally, my husband averred that "[Cahill Gordon] does not

represent [Sony BMG Music Entertainment, Columbia House, Warner

Music Group Corp., Time Warner, Inc., Vivendi Universal,

Bertelsmann AG, or EMI Music North America] in connection with

any governmental investigation relating to digital music." (Id.

¶ 8).

     On January 31, 2007, Messrs. Stoia and Lovell replied to

the January 12, 2007 Letter and the Kavaler Affidavit.  (Dkt.

No. 54 (the "January 31, 2007 Letter")).  As to timeliness, they

contended that "Mr. Lovell did not represent the transferee

[P]laintiffs and their counsel (all of whom were not before [the

Court]) when his clients and firm responded in July 2006 [in the

Devine action]" and that "[t]ransferee [P]laintiffs responded in

a timely fashion after they received the Court's [Memorandum] by

sending Plaintiffs' [December 20, 2006] Letter after all

transferee counsel had an opportunity to provide their input to

the letter." (Id. at 2).  They also asserted that the
Memorandum was placed on the docket in the Consolidated Action
on November 17, 2006 "to give notice of the [recusal] issue to
the transferee parties." (Id.).

On the Release Issue, Messrs. Stoia and Lovell stated that
the Kavaler Affidavit is insufficient because it "does not
answer what [my husband's] responsibilities were [in the
California CD MDL, Ottinger, and the Maine CD MDL] and the full
extent of his involvement." (Id. at 3).  According to them,
"[t]hese facts are important because [D]efendants contend
Ottinger and [the] California CD MDL may limit or be dispositive
of certain of [P]laintiffs' claims here." (Id.).  On the
Governmental Investigation Issue, Messrs. Stoia and Lovell
stated that the Kavaler Affidavit is insufficient because it
"does not disclose all instances where [my husband] and/or
Cahill Gordon have represented, consulted with or have offered
counsel to defendants in connection with any governmental
investigation." (Id. (emphasis in original)).

Since Messrs. Stoia and Lovell were still not satisfied
with the disclosures pertaining to the recusal issue, they asked
for additional "categories of information . . . which are
appropriate to consider in determining whether recusal is
warranted in § 455(a) and (b)(4)." (Id. at 4).  The requested
supplemental information included, inter alia, the following

15

categories: (i) "[a] detail of all instances where Mr. Kavaler
and/or Cahill Gordon has been engaged by, consulted by or
represented any of the [D]efendants or their predecessors and
related entities" ("Category One"); (ii) "[a] summary of hours
chargeable and fees generated by Cahill Gordon and Mr. Kavaler
for each of the [D]efendants, their predecessors and related
entities by year from 2001 to the present" ("Category Two");
(iii) "[w]hether Cahill Gordon or Mr. Kavaler consulted with
MusicMatch, pressplay or any of the [D]efendants in establishing
firewalls, communication guidelines, safeguards, and other
protections to prevent exchanges of information, or other
conduct, that could negatively affect competition" ("Category
Three"); and (iv) "[w]hether Cahill Gordon or Mr. Kavaler was
involved in any way in the preparation of the 'White Paper' that
was presented to the Department of Justice in connection with
its 2001 investigation of the Digital Music Industry" ("Category
Four"). (Id., Ex. 4).

On February 8, 2007, Defendants submitted my husband's
supplemental affidavit (the "Kavaler Supplemental Affidavit") in
response to the January 31, 2007 Letter.  With respect to the
Release Issue, my husband averred that "[t]he partner with day
to day involvement in [the California CD MDL, Ottinger, and the
Maine CD MDL] was [his] partner Dean Ringel."  (Kavaler Supp'l

Aff. ¶ 4).[9]  My husband further averred that "[he] was not
involved in the resolution of any of these matters, including
any settlement that may have been reached."  (Id.).
Accordingly, "assuming arguendo a witness from [Cahill Gordon]
were an appropriate person to testify about [the Release Issue],
[my husband] would not be that person."  (Id.).  With respect to
the Governmental Investigation Issue, "without entering into
matters that may be privileged or confidential, [my husband]
recite[d] without equivocation that [Cahill Gordon] do[es] not
represent any of the [D]efendants in th[e] [Consolidated Action]
in connection with any investigation of any kind whatsoever by
any governmental entity into any subject matter relating to the
[Consolidated Action]."  (Id. ¶ 5).

    My husband also responded specifically to the categories of
additional information sought by Messrs. Stoia and Lovell.  As
to Categories One and Two, the Kavaler Supplemental Affidavit
confirmed that the Kavaler Affidavit "set forth certain
information [e.g., total firm hours billed] . . . to all
engagements by [Cahill Gordon] for [Sony BMG Music
Entertainment, Columbia House, Warner Music Group Corp., Time
Warner, Inc., Vivendi Universal, Bertelsmann AG, and EMI Music

_____

[9] "Kavaler Supp'l Aff." refers to the Kavaler Supplemental
Affidavit submitted by Defendants as an attachment to a letter
from Ms. Winston to the Court, dated Feb. 8, 2007.  (Dkt. No.
55).

North America] for the year 2006." (Id. ¶ 2 (emphasis in
original)). My husband further observed that one can
"juxtapose[] the number of hours that [he] logged to the total
number of hours [Cahill Gordon] logged to ascertain" his role in
those matters. (Id. ¶ 3). For instance, my husband noted that
his fewer than 20 hours billed to Sony BMG Music Entertainment,
Columbia House, and Warner Music Group Corp. represented fewer
than 5% of the billable hours charged by Cahill Gordon to those
clients in 2006. (Id.).

As to Category Three, my husband averred that he has "never
consulted with or represented any entities known as 'MusicMatch'
or 'pressplay'" and that he has "never heard of either entity."
(Id. ¶ 7). He also averred that "he has never consulted with
any of the [D]efendants with regard to 'firewalls, communication
guidelines, safeguards, and other protections to prevent
exchanges of information, or other conduct, that could
negatively affect competition.'" (Id.). My husband further
averred that "[he is] not at liberty to reveal what privileged
advice [Cahill Gordon] may have given to clients from time to
time, but [he does not] believe it is inconsistent with that for
[him] to say that whatever advice might have been given by
[Cahill Gordon] on these subjects, [he] was not the person who
gave it." (Id.). Finally, as to Category Four, my husband
averred that "[he does] not know what White Paper is being

referred to and, so far as [he is] aware, [he] was not involved in its preparation in any way." (Id.).

Although initially framed as a request for a pre-motion conference, the Court construes the December 20, 2006 and the January 31, 2007 Letters as a formal motion for recusal under 28 U.S.C. § 455(a) and (b)(4).[10]  As stated by Messrs. Stoia and Lovell, "[P]laintiffs apprised the Court of their concern that [my husband's] and Cahill Gordon's representation of the [D]efendants creates a situation which requires recusal." (Dkt. No. 54 at 1 (emphasis added)).[11]

DISCUSSION

1.   Judicial Disqualification Under 28 U.S.C. § 455

Section 455 of Title 28 provides, in pertinent part, as follows:

> (a)  Any . . . judge . . . shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

---

[10]  In light of the Court's familiarity with the recusal issue here, the fact that the Court already held a conference on the very issue, and the absence of disputed issues of fact, the Court is exercising its discretion not to hold a second conference or a hearing on the recusal issue.

[11]  At the request of proposed Interim Co-Lead Counsel (dkt. no. 39 at 3), the Court continued all pre-trial dates set forth in the December 5, 2006 Order during the pendency of this motion. (Dkt. No. 36).  This continuance included the Court's consideration of, inter alia, the Class Counsel Motion.

(b)  He shall also disqualify himself in the following circumstances:

> (4)  He knows that he, individually or as a fiduciary, or his spouse . . . , has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding[.]

28 U.S.C. § 455 (a) & (b)(4).

The motion for recusal is fully within the Court's authority to hear and decide.  <u>See</u> <u>In re Drexel Burnham Lambert Inc.</u>, 861 F.2d 1307, 1312 (2d Cir. 1988) ("Discretion is confided in the district judge in the first instance to determine whether to disqualify himself[.]") (citation omitted). In deciding the recusal motion, the Court must "weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning [my] impartiality might be seeking to avoid the adverse consequences of [my] presiding over their case."  <u>Id.</u>  Although litigants are entitled to an unbiased judge, they are not entitled to a judge of their choosing.  <u>Id.</u>  Accordingly, "[a] judge is as much obliged not to recuse himself when it is not called for as he is obligated to when it is."  <u>Id.</u> (citation omitted).

2.   Timeliness of Recusal Motion[12]

        Although Section 455 of Title 28 does not explicitly
address timeliness, the Court of Appeals has evolved such a
requirement, and "[i]t is well-settled that a party must raise
its claim of a district court's disqualification at the earliest
possible moment after obtaining knowledge of facts demonstrating
the basis for such a claim."  Apple v. Jewish Hosp. & Med. Ctr.,
829 F.2d 326, 333 (2d Cir. 1987); see also LoCascio v. United
States, 473 F.3d 493, 497 (2d Cir. 2007) (same).  The Court of
Appeals has articulated the following factors for deciding
whether a recusal motion is timely: (i) "the movant has
participated in a substantial manner in trial or pre-trial
proceedings;" (ii) "granting the motion would represent a waste
of judicial resources;" (iii) "the motion was made after the
entry of judgment;" and (iv) "the movant can demonstrate good
cause for delay."  Apple, 892 F.2d at 334 (citations omitted).

_____

[12] For purposes of the timeliness discussion, references to "Mr.
Stoia" include Mr. Stoia and all Lerach Coughlin attorneys
(including his partners Ms. Sweeney and Mr. Burke), and
references to "Mr. Lovell" include Mr. Lovell and all Lovell
Stewart attorneys.  See Universal City Studios, Inc. v.
Reimerdes, 104 F. Supp. 2d 334, 349-50 (S.D.N.Y. 2000) ("Any
other rule would allow a member of a law firm aware of facts
that might lead to judicial disqualification to sit on the
information, wait to see which way the wind appears to be
blowing with the judge, and then come forward in an effort to
get rid of the judge if a colleague responsible for a case
begins to perceive that the judge is unreceptive in the client's
position or even simply wants a delay.").

The third factor is not relevant here, but the remaining factors all weigh in favor of finding the motion for recusal untimely.

With regard to the first factor, Mr. Lovell, as Lead Counsel on behalf of Plaintiffs in the Seley and Devine actions, and as proposed Interim Co-Lead Counsel on behalf of all Plaintiffs and the proposed Class(es) in the Consolidated Action, has participated in a substantial manner since becoming aware of the contents of the Memorandum. Since at least July 3, 2006, the time when Mr. Lovell wrote the Court to "draw [my] attention to . . . matters that [I] may consider relevant under 28 U.S.C. § 455(a)" (dkt. no. 26, Ex. 1 at 1), Mr. Lovell or members of his law firm have taken the following actions: (i) appeared at the July 26, 2006 conference in the Seley, Devine, Corkery, and Zedek actions on the very issue of recusal (see supra at 4-5); (ii) appeared before the JPML on July 27, 2006 for oral argument on his motion for transfer and coordination or consolidation of the Digital Music actions to this District (see supra at 5-6); (iii) met and conferred with counsel for Defendants on a proposed agenda of issues to be discussed at the initial pre-trial conference in the Consolidated Action on November 17, 2006 (see supra at 7); (iv) appeared and participated in that initial pre-trial conference (see supra at 7-8); (v) jointly submitted a proposed Order setting forth various pre-trial dates in the Consolidated Action

on December 4, 2006, which was entered on December 5, 2006 (see supra at 8); and (vi) jointly submitted the Class Counsel Motion (see supra at 8-9).  Thus, Mr. Lovell has certainly actively participated in the pre-trial proceedings before this Court.

Mr. Stoia has also participated in a substantial manner since becoming constructively aware of the contents of the Memorandum.  Under Section 144 of Title 28, which is to be construed in pari materia with Section 455, see Apple, 829 F.2d at 333, a party "is charged with knowledge of all facts known or knowable, if true, with due diligence, from the public record or otherwise."  Universal City Studios, Inc. v. Reimerdes, 104 F. Supp. 2d 334, 349 (S.D.N.Y. 2000) (citation and internal quotation marks omitted); see also United States v. Daley, 564 F.2d 645, 651 (2d Cir. 1977) (holding motion for recusal untimely because, inter alia, the facts upon which it was based "as a matter of public record, were at all times ascertainable by counsel").

It is undisputed that the Memorandum was placed on the public dockets in the Corkery and Seley actions on April 20, 2006 and June 12, 2006, respectively.  (See supra at 2-3).  It is also uncontroverted that the Court's July 24, 2006 Order was placed on the public dockets in the Seley, Devine, Corkery, and Zedek actions.  (See supra at 4).  Since at least July 27, 2006, Mr. Stoia has taken the same actions as Mr. Lovell.

Mr. Stoia contends that the Court should focus solely on his participation since the Court issued the Memorandum in the Consolidated Action on November 17, 2006 because it "disclosed for the first time to the MDL transferee [P]laintiffs, and to [P]laintiffs who had been assigned to [former Chief Judge] Mukasey, that [my husband] . . . and his law firm . . . have represented certain [D]efendants." (Dkt. No. 54 at 1). According to Mr. Stoia, "[i]t would be inefficient and contrary to the purpose of the rules of multidistrict litigation for a [P]laintiff in an action filed in one court to be required to review the dockets of actions filed in other courts and appear in those actions prior to transfer." (Id. at 2).  That is why, according to Mr. Stoia, "when signing [the December 20, 2006] Letter, Mr. Lovell did so 'in his capacity as proposed [I]nterim [C]o-[L]ead [C]ounsel for those [P]laintiffs and counsel whose cases have been transferred to this district and who have all agreed to make this request of the Court in response to the Court's Memorandum.'"). (Id. at 1 (quoting Dkt. No. 39 at 1 n.2)).

This Court disagrees.  While Mr. Stoia's position, that counsel in one multidistrict action should not be required to review the docket sheet in every action and to appear before transfer by the JPML, might be true for counsel in a single case, it might well be expected that counsel seeking to have his

law firm appointed as Interim Co-Lead Counsel would promptly,
after transfer, review the docket sheet in each case in which
his firm seeks to be appointed Co-Lead Counsel.  Moreover, Mr.
Stoia's efficiency argument is belied by the fact that the
December 20, 2006 Letter was based in part on his electronic
review of the docket sheets of actions in which my husband
and/or Cahill Gordon appeared on behalf of certain Defendants
which demonstrates that apparently it is not very difficult to
perform such a search.  (Dkt. No. 39 at 2 ("A Lexis[Nexis]
[CourtLink] search showed [that] Mr. Kavaler has represented
Sony's music division for over a decade in at least 13 cases
. . . [and] Cahill Gordon has represented [D]efendants, or their
wholly-owned subsidiaries, in at least 44 instances . . . .")
(citing Exs. 3-4)).  In any event, for the reasons that the
second and fourth factors weigh in favor of finding the motion
for recusal untimely, "it would be inefficient and contrary to
the purpose of the rules of multidistrict litigation" for the
Court to recuse itself here.[13]

---

[13] Even if the Court limited its inquiry to Mr. Stoia's
participation in the Consolidated Action since November 17,
2006, Mr. Stoia nonetheless waited for over one month to raise
the recusal issue.  During that period of delay, he jointly
submitted a proposed Order setting forth various pre-trial dates
on December 4, 2006, which was entered on December 5, 2006, and
he jointly submitted the Class Counsel Motion for, inter alia,
appointment of his law firm as Interim Co-Lead Counsel.  In
(continued)

With regard to the second factor, granting the motion for recusal would clearly represent a waste of the judicial resources of this Court and the JPML.  First, this Court held a conference on July 26, 2006 on the issue of recusal in the Devine, Seley, Corkery, and Zedek actions and concluded, with counsel's acquiescence, that further action as to recusal was not warranted.  (See supra at 4-5).  Second, after the July 26, 2006 conference, the JPML heard argument on the motion to transfer and coordinate or consolidate this multidistrict litigation (during which argument the recusal issue was apparently not raised), and the JPML has now transferred over 30 Digital Music actions to this Court.  (See supra at 5-6).  Third, this Court has already held an initial pre-trial conference in the Consolidated Action, ruled on substantive matters, such as pre-complaint discovery, entered an Order putting this multidistrict litigation on track to proceed, and reviewed the Class Counsel Motion.  (See supra at 6-9).  If

---

(continued)
Apple, the Court of Appeals held that a delay of only two months rendered a recusal motion untimely where, unlike here, granting the motion would not have resulted in the waste of judicial resources.  829 F.2d at 334.  See also Lamborn v. Dittmer, 726 F. Supp. 510, 515 (S.D.N.Y. 1989) ("Recusal motions are often denied on the basis of untimeliness where there has been only a short delay.") (citing, inter alia, In re Martin-Trigona, 573 F. Supp. 1237, 1244-45 (D. Conn. 1983) (holding motion untimely based on delay of 12 days), appeal dismissed, 770 F.2d 157 (2d Cir. 1985), cert. denied, 475 U.S. 1058 (1986)).  Thus, even under the standard advocated by Mr. Stoia, the motion for recusal is untimely.

recusal were granted, the last six months of work would be for naught, and the process would begin all over -- further delaying resolution of the Consolidated Action.

With respect to the fourth factor, there is no good cause for the delay in bringing the motion for recusal here.  Mr. Lovell does not represent in the December 20, 2006 or January 31, 2007 Letters that he raised the recusal issue before the JPML.  Given the temporal proximity among Mr. Lovell's July 3, 2006 Letter, the July 26, 2006 conference before this Court, the July 27, 2006 hearing before the JPML, and the August 16, 2006 decision by the JPML to transfer the Digital Music actions to this Court, Mr. Lovell's omission is fatal to this motion for recusal.  To the extent Mr. Lovell, or any other counsel in the Seley, Devine, Corkery, and Zedek actions, had any residual concern over the recusal issue, despite failing to seek recusal after the July 26, 2006 conference, the JPML was the ideal, and obvious, forum in which to raise the issue again.[14]  At the time,

---

[14] Perhaps Mr. Lovell, or counsel in the Seley, Devine, Corkery, and Zedek actions, concluded that raising the recusal issue before the JPML would have weakened the motion for transfer and coordination or consolidation of the then-pending Digital Music actions to this District.  While that outcome may have very well been the result, the promotion of the just and efficient conduct of a multidistrict litigation trumps an attorney's private forum shopping considerations.  Of course, the JPML could still have transferred the multidistrict litigation to this District after being apprised of the recusal issue.  At that time, former Chief Judge Mukasey had not resigned and was presiding over three out
(continued)

this District and the Northern District of California were the
only two Districts being considered as the transferee forum for
this multidistrict litigation.  (See supra at 5-6).[15]  Indeed,

---

(continued)
of the seven Digital Music actions then-pending in this
District.  (See supra at note 2).  Moreover, the JPML could have
assigned this multidistrict litigation to any judge in this
District.

[15] For this reason, the Court cannot exclude the possibility that
Mr. Stoia (or perhaps counsel for other transferee Plaintiffs)
was aware of the recusal issue prior to November 17, 2006.
After all, Mr. Stoia's representations in the December 20, 2006
and January 31, 2007 Letters are incomplete in that they fail to
disclose when he first learned of the Memorandum.  This omission
is glaring in light of the fact that Mr. Stoia brought the
Bulcao action (see supra at note 5), which was, according to Mr.
Stoia, the "product of months of pre-filing research undertaken
by attorneys at [Lerach Coughlin]" and the "first comprehensive
federal action" against Defendants.  (Class Counsel Mem. at 2).
Mr. Stoia (and counsel for other transferee Plaintiffs) then
sought to transfer and coordinate or consolidate the then-
pending Digital Music actions to the Northern District of
California.  (See Class Counsel Mem. at 10; see also Digital
Music, 444 F. Supp. 2d at 1352 n.3).  It would certainly have
bolstered their argument in favor of the Northern District of
California if the Court presiding over the majority of the then-
pending Digital Music actions in the only other District being
considered to receive the multidistrict litigation had a recusal
issue that, regardless of its merits, would have, as it has done
here, resulted in the delay of the prosecution of the
litigation.  See In re Western States Wholesale Natural Gas
Antitrust Litig., 290 F. Supp. 2d 1376, 1378 (J.P.M.L. 2003)
(transferring multidistrict litigation to the District of Nevada
notwithstanding the fact that the litigation "ha[d] a strong
California nexus . . . because of potential recusal issues . . .
affecting the assignment of the class actions . . . to a
California resident judge").  Thus, Mr. Stoia (and perhaps
counsel for other transferee Plaintiffs) had every incentive to
raise the recusal issue before the JPML.  Yet, in the December
20, 2006 and January 31, 2007 Letters, Mr. Stoia did not
represent that he (or counsel for other transferee Plaintiffs)
raised the recusal issue to the JPML.

the purpose of the JPML is to transfer actions pending in different districts involving one or more common questions of fact to a single district upon the determination that such transfer will, <u>inter alia</u>, "promote the just and <u>efficient</u> conduct of such actions."  28 U.S.C. § 1407(a) (emphasis added); <u>see also</u> <u>Digital Music</u>, 444 F. Supp. 2d at 1352 ("Centralization under Section 1407 is necessary in order to . . . conserve the resources of . . . the judiciary.").  Recusal here would clearly frustrate the purpose of Section 1407(a).

Regarding the proceedings before this Court in the Consolidated Action, the recusal issue was also not raised at the initial pre-trial conference on November 17, 2006.  (<u>See</u> <u>supra</u> at 6-8).  It is undisputed that the parties, including some counsel for transferee Plaintiffs, met and conferred before that conference.  (<u>See</u> <u>supra</u> at 6-7).  It is also uncontroverted that Lovell Stewart and Lerach Coughlin attorneys participated in those discussions.  (<u>See</u> Class Counsel Mem. at 10 ("Lerach Coughlin attorneys . . . took the lead amongst [P]laintiffs' counsel with Lovell Stewart in negotiating resolution to a variety of procedural and case management matters with [D]efense counsel.")).  Finally, it is undisputed that Mr. Lovell and Mr. Stoia's partners, Ms. Sweeney and Mr. Burke, appeared at that conference and spoke on behalf of all Plaintiffs with respect to issues of great importance to them, such as pre-complaint

discovery and their proposed organizational structure.  Given

that Mr. Lovell was fully aware of the recusal issue at that

time, there is no good cause for the failure of Messrs. Stoia

and Lovell to raise the issue of recusal at that conference.[16]

---

[16] If Mr. Stoia were to assert that he was still unaware of the
recusal issue at that time, then he would be in the awkward
position of conceding that Mr. Lovell, his proposed Interim Co-
Lead Counsel, failed to disclose to him an issue they now say is
of great importance to the prosecution of this litigation.  Such
conduct by Mr. Lovell would certainly fall below the standards
expected of lead counsel in this kind of complex litigation.
See In re Ivan F. Boesky Sec. Litig., 948 F.2d 1358, 1365 (2d
Cir. 1991) ("Lead counsel ordinarily have major responsibility
for formulating and presenting positions on substantive and
procedural issues during the litigation.  Typically they act for
the group – either personally or by coordinating the efforts of
others – in presenting written and oral arguments and
suggestions to the court . . . .") (quoting The Manual for
Complex Litigation (Second) § 20.221 (1985)); In re Payment Card
Interchange Fee & Merch. Disc. Antitrust Litig., No. MDL 05-1720
(JG)(JO), 2006 WL 2038650, at *2 (E.D.N.Y. Feb. 24, 2006) ("The
Manual for Complex Litigation . . . counsels that in making . .
. an appointment [of lead counsel], [the Court] should consider
factors as the qualification and competence of counsel, the
ability of counsel to fairly represent diverse interests, and
'the attorneys' ability to command the respect of their
colleagues and work cooperatively with opposing counsel and the
court.'") (quoting The Manual for Complex Litigation (Fourth)
§ 10.224 (2004)); cf. 3 Alba Conte & Herbert B. Newberg, Newberg
on Class Actions § 9:1 (4th ed. 2002) ("[A]ttorneys as officers
of the court, have a direct interest and responsibility for
assisting the efficient adjudication of controversies that they
bring or defend in court.").  As noted above, Mr. Stoia failed
to state when he first learned of the recusal issue in the
December 20, 2006 or January 31, 2007 Letters.  (See supra at
note 15).  The Court can only infer that the glaringly missing
information might well place Mr. Stoia (and perhaps counsel for
other transferee Plaintiffs) in the awkward position of
admitting that Mr. Lovell failed to apprise them of the recusal
issue before the initial pre-trial conference in the

(continued)

Finally, the recusal issue was not raised until one month after the initial pre-trial conference in the Consolidated Action on December 20, 2006. It is undisputed that the Court ruled against Plaintiffs by denying them pre-complaint discovery from Defendants. (See supra at 7-8). Given the current uncertainty regarding the degree of pleading specificity required in antitrust cases brought under Section 1 of the Sherman Act, such as the Consolidated Action, this issue may be of some significance to Plaintiffs. See Twombly v. Bell Atlantic Corp., 313 F. Supp. 2d 174, 189 (S.D.N.Y. 2003) (dismissing complaint alleging a price-fixing conspiracy under Section 1 of the Sherman Act based on asserted parallel pricing), rev'd, 425 F.3d 99, 108-13 (2d Cir. 2005) (holding that there is no heightened pleading standard in antitrust cases brought under Section 1 of the Sherman Act), cert. granted, 74 U.S.L.W. 3713 (U.S. June 26, 2006) (No. 05-1126). Thus, the Court cannot exclude the possibility that Plaintiffs were dissatisfied with this decision and now seek a second bite at the apple before a different judge.

Accordingly, Plaintiffs' motion for recusal under Section 455(a) and (b)(4) is untimely.

---

(continued)
Consolidated Action, during the meet and confer process with counsel for Defendants over a proposed agenda, and at the conference.

3.   Merits of Recusal Motion

Assuming arguendo that the recusal motion is not untimely,
the Court addresses the merits of Plaintiffs' motion for
disqualification under Section 455(a) and (b)(4) in turn.   In
short, Messrs. Stoia and Lovell contend that the Court will be
inclined not to rule adversely to Defendants on the Release or
the Governmental Investigation Issues because of my husband's
prior representation of certain Defendants in other, supposedly
related matters.


A.   Section 455(a)

With respect to disqualification under Section 455(a),
providing for disqualification where a judge's "impartiality
might reasonably be questioned," the Court of Appeals has
cautioned that "the grounds asserted in a recusal motion must be
scrutinized with care, and judges should not recuse themselves
solely because a party claims an appearance of partiality."   In
re Aguinda, 241 F.3d 194, 201 (2d Cir. 2001).   The test to be
applied is an objective one: whether a reasonable person, who
knows and understands all the relevant facts, would conclude
that the Court's impartiality might be questioned.   See United
States v. Lovaglia, 954 F.2d 811, 815 (2d Cir. 1992) (citing
Apple, 829 F.2d at 333).   "Where a case . . . involves remote,
contingent, indirect or speculative interests, disqualification

is not required." Id. (citation omitted). Section 455 "does not compel disqualification 'simply on unfounded innuendo concerning the possible partiality of the presiding judge.'" Canino v. Barclays Bank, PLC, No. 94 Civ. 6314, 1998 WL 7219, at *3 (S.D.N.Y. Jan. 7, 1998) (quoting El Fenix de Puerto Rico v. M/Y Johanny, 36 F.3d 136, 140 (1st Cir. 1994)).

The decision of the Court of Appeals in In re Drexel Burnham Lambert Inc., 861 F.2d 1307, 1314-15 (2d Cir. 1988) is instructive here. In that case, the late Senior District Judge Milton Pollack's wife was a controlling shareholder of a close corporation that agreed to sell all of its shares on the condition that the purchaser obtain financing. Id. at 1310. Drexel, a Defendant appearing before Judge Pollack in a case unrelated to the transaction, agreed to provide the financing to the purchaser and, at the conclusion of the transaction, Judge Pollack's wife or family would receive $30 million from the sale. Id. at 1314. The Court of Appeals concluded that there was no appearance of impropriety because "Judge Pollack's connection is too remote to mandate recusal because Drexel has no obligation direct or indirect to Mrs. Pollack." Id. at 1315.

Courts have uniformly rejected the argument that an appearance of impropriety exists in the following situation: (i) a judge's spouse is a partner in a law firm that represents a litigant in matters other than the case before the judge; and

(ii) the spouse did not perform any work at the law firm for the litigant or worked for the litigant on unrelated matters.  See Canino, 1998 WL 7219, at *3 ("Plaintiff claims that . . . [Judge Miriam Goldman Cederbaum's] husband is a partner in a firm which represented Defendant and that, as a result of this relationship, she and her husband benefited from fees from that client, and thus that her impartiality might reasonably be questioned.  This chain of causation is too attenuated to satisfy the requirements of § 455(a).") (emphasis added); In re Billedeaux, 972 F.2d 104, 105-06 (5th Cir. 1992) ("[A] reasonable person . . . would know that any interest that could be attributed to Judge [Edith Brown] Clement in the fate of her husband's law firm's sometime client is so remote and speculative as to dispel any perception of impropriety."); In re Hathaway Ranch P'Ship, 116 B.R. 208, 213-15 (Bankr. C.D. Cal. 1990) (same).

Here, it is undisputed that neither my husband nor Cahill Gordon is representing any Defendant in the Consolidated Action. However, my husband has worked for some of these Defendants in prior, assertedly related litigation.[17]  Nevertheless, courts

---

[17] The only prior, supposedly related litigation bearing on the issue of recusal is the California CD MDL, Ottinger, and the Maine CD MDL.  However, as noted above, Cahill Gordon has "largely concluded [its] representation of [Sony BMG Music Entertainment]," and the "litigated matters in each of these
(continued)

which have addressed this situation have concluded that a
spouse's or child's work on ongoing, related litigation does not
rise to the level of an appearance of impropriety. See Microsoft
Corp. v. United States, 530 U.S. 1301, 121 S.Ct. 25, 26 (2000)
(the late Chief Justice William H. Rehnquist declined to recuse
himself from deciding whether to hear the appeals of Microsoft
related to its potential antitrust liability from the
Government's lawsuit where his son was a partner at a law firm
working on related private litigation for Microsoft and the
Supreme Court's decision "could have [had] a significant effect
on Microsoft's exposure to antitrust suits in other courts,"
because "a well-informed individual would [not] conclude that an
appearance of impropriety exists simply because my son
represents, in another case, a party that is also a party to
litigation pending in this Court"); Diversifoods, Inc. v.
Diversifoods, Inc., 595 F. Supp. 133, 134, 139-40 (N.D. Ill.
1984) (holding that there was no appearance of impropriety where

_____

(continued)
cases have been resolved." (Kavaler Aff. ¶ 3(A)).  The minimal
role played by my husband and Cahill Gordon in these matters in
recent times is demonstrated by the extremely low number of
hours billed by the firm to those cases -- some 30 hours in
2006.  (See supra at 13).  As to work done prior to 2006, my
husband averred that 2006 is "the most recent calendar year for
which full year records are available." (Kavaler Supp'l Aff.
¶ 6).  If these matters were substantial and ongoing, one might
consider historical billing.  However, in light of the
unchallenged representation that the litigations are effectively
over, billings in the most recent calendar year are sufficient.

the presiding judge's husband was a "member of the firm of
Mayer, Brown & Platt and the firm . . . presently represents the
defendant in other matters, and, prior to the filing of this
lawsuit, had some connection with the events underling this
litigation").

Moreover, Messrs. Stoia's and Lovell's speculation that the
Court will be unwilling to rule against Defendants on the
Release or the Governmental Investigation Issues because of my
husband's prior representation in supposedly related cases is
meritless.  On the Release Issue, my husband has averred that he
was not "[t]he partner with day to day involvement in [the
California CD MDL, Ottinger, and the Maine CD MDL]," that his
partner Dean Ringel had that responsibility, and that he "was
not involved in the resolution of any of these matters,
including any settlement that may have been reached."  (Kavaler
Supp'l Aff. ¶ 4).  Thus, "assuming arguendo a witness from
[Cahill Gordon] were an appropriate person to testify about [the
Release Issue], [my husband] would not be that person."  (Id.).
On the Governmental Investigation Issue, my husband has averred
"that [Cahill Gordon] do[es] not represent any of the
[D]efendants in connection with any investigation of any kind
whatsoever by any governmental entity into any subject matter
relating to the [Consolidated Action]."  (Id. ¶ 5).

Applying this clear law to the facts set out above, no reasonable person would conclude that my impartiality might reasonably be questioned on the basis of my husband's prior representation of some Defendants in other, supposedly related cases.

B.   Section 455(b)(4)

As noted above, Section 455(b)(4) requires disqualification where the judge "or his spouse . . . has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding."[18]   The decision of

---

[18] For purposes of this discussion, the Court addresses only the portion of subsection (b)(4) of Section 455 requiring recusal where a judge's spouse has "any other interest that could be substantially affected by the outcome of the proceeding."  My husband, as a lawyer, cannot have a "financial interest in the subject matter in controversy or in a party to the proceeding" within the meaning of subsection (b)(4).  First, legal representation does not qualify as a "financial interest in the subject matter of the controversy."  Subsection (d)(4) defines "financial interest" as "ownership of a legal or equitable interest, however small, or a relationship as director, adviser, or other active participant in the affairs of a party . . . ."  The term "adviser" is not a synonym for "lawyer," which appears throughout Section 455 and is noticeably absent from the definition of "financial interest."  See, e.g., 28 U.S.C. § 455(b)(5)(ii) (requiring disqualification where a "[judge] or his spouse . . . [i]s acting as a lawyer in the proceeding").  Thus, Congress did not intend to cover my husband's relationship, as outside counsel to certain Defendants in prior, allegedly related litigation, in subsection (b)(4).  See Sullivan v. Chesapeake & Ry. Co., Nos. 90-1136, 90-1412,
(continued)

the Court of Appeals in <u>Pashaian v. Eccelston Properties, Ltd.</u>,
88 F.3d 77, 83-84 (2d Cir. 1996) is instructive in considering
this section.[19]   In <u>Pashaian</u>, the Court of Appeals rejected the
<u>per se</u> rule of automatic recusal articulated by the Fifth
Circuit when a partner in a law firm appearing before a judge is
related to that judge within the third degree, such as a spouse.
<u>Id.</u> at 83.  According to the Court of Appeals, "[i]t would
simply be unrealistic to assume . . . that partners in today's
law firms invariably 'have an interest that could be
<u>substantially affected</u> by the outcome of' any case in which any
other partner is involved."   <u>Id.</u> at 83-84 (quoting 28 U.S.C.
§ 455(b)(5)(iii)) (emphasis in original).   Here, of course, my
husband's firm is not appearing in the matter before me.

_____

(continued)
1991 WL 216872, at *5, 947 F.2d 946 (6th Cir. Oct. 25, 1991)
(unpublished decision) (stating that "[b]ecause [S]ection
455(b)(5)(ii) clearly covers the lawyer-client relation . . . we
are not convinced that the term" adviser in Section 455(d)(4)
"was also intended to cover this relationship").   Second, my
husband is not representing a "party to the proceeding," thus,
he cannot have a "financial interest" in the outcome of the
Consolidated Action.

[19] Although the Court of Appeals was applying subsection
(b)(5)(iii) in <u>Pashaian</u>, the statutory language is virtually
identical to that found in the part of subsection (b)(4) at
issue here.  (<u>See</u> <u>supra</u> at note 18).   Subsection (b)(5)(iii)
mandates disqualification where a judge's spouse "[i]s known
. . . to have an interest that could be substantially affected
by the outcome of the proceeding."  Subsection (b)(4) mandates
disqualification where "he, individually or as a fiduciary, or
his spouse . . . has . . . any other interest that could be
substantially affected by the outcome of the proceeding."

In Pashaian, the Court of Appeals concluded that immediate recusal was not warranted where the brother-in-law of former District Judge John S. Martin, Jr., was a partner of Cahill Gordon, the law firm which was representing a Defendant before the Judge.[20]  Former Judge Martin "consider[ed], under seal, the extent [of his brother-in-law's] participation in the net income of Cahill [Gordon], and the amount at stake in the . . . litigation, [and] . . . concluded that [his brother-in-law's] interest would not be 'substantially affected' by the outcome of [the] case."  Id. at 84.  Former Judge Martin "also took judicial notice of those matters that add to the reputation of major law firms in the City of New York and conclude[d] that insofar as the reputation of [Cahill Gordon] is concerned, this matter [was] not of that significance to either add or detract from its reputation in the City of New York and, indeed, even in the nation or perhaps the world - given its offices in Europe." Id.  According to the Court of Appeals, "[t]hese reasonable conclusions should not be ignored in favor of an unrealistic generalization that . . . is not supported, much less compelled, by the text of § 455(b)(5)(iii)."  Id.

Again, my husband's firm is not representing a party in the Consolidated Action, and thus the facts presented here present a

---

[20] Coincidentally, my husband was the lead attorney on the matter.

significantly less compelling case for recusal than those in

Pashaian where recusal was not required.  Moreover, the record

does not suggest that my husband has "any other interest that

could be substantially affected by" the resolution of the

Release and Governmental Investigation Issues in the

Consolidated Action.  28 U.S.C. § 455(b)(4).  First, he has

disclosed that Cahill Gordon's work for certain Defendants

amounted to fewer than .1% of the firm's total hours billed in

2006.  (Kavaler Aff. ¶¶ 3-6; Kavaler Supp'l Aff. ¶ 3).  Second,

apparently based on their review of Cahill Gordon's website,

Messrs. Stoia and Lovell stated that my husband has "prominently

represented [D]efendants [in the Consolidated Action] in a

number of [other] matters" and that the website "lists a few of

the engagements."  (Dkt. No. 54 at 4).  Notwithstanding this

flattering characterization of my husband's legal career, it is

readily apparent from the same website information that my

husband has "prominently represented" numerous individuals and

companies in a wide array of industries in high-profile

litigations.[21]  Thus, it is utter speculation on the part of

Messrs. Stoia and Lovell to assert that any ruling adverse to

Defendants on the Release or Governmental Investigation Issues

_____

[21] The same is true for my husband's partners Dean Ringel and
Kevin Burke, whom Messrs. Stoia and Lovell identified from their
review of Cahill Gordon's website as having worked for
Defendants on prior, allegedly related cases.  (Dkt. No. 54 at 3
n.2).

(or any other matter) in the Consolidated Action will substantially affect an interest of my husband or Cahill Gordon. See Canino, 1998 WL 7219, at *4 ("Nor can it be said that simply because one or more partners in [Judge Miriam Goldman Cederbaum's] husband's law firm represented Defendant in some matters, the Judge's husband possessed an interest that could be 'substantially affected' by the outcome of the proceedings."); Diversifoods, 595 F. Supp. at 133, 138-39 (holding that "Mayer, Brown & Platt does not have an interest which would be substantially affected by the outcome of this litigation simply as a result of its representation of the Defendant in other matters" where the record showed that the firm is not Defendant's "only outside lawyer and it is not a material client to the firm"); cf. Transportes Coal Sea de Venezuela C.A. v. SMT Shipmanagement & Transport Ltd., No. 05 Civ. 9029, 2007 WL 62715, at *10 (S.D.N.Y. Jan. 9, 2007) ("[A] claim that a judge's spouse is 'a partner in a firm which represented [a party appearing before the judge] and that, as a result of this relationship, [the judge] and her husband benefited from fees from that client' describes a chain of causation too attenuated to reasonably question a judge's impartiality.") (citations omitted and changes in original).

Accordingly, Plaintiffs' motion for recusal under Section 455(a) and (b)(4) is without merit.

CONCLUSION

For the reasons set forth above, the motion for recusal [dkt. nos. 39 and 54] is denied.

Counsel for the parties shall confer and submit, no later than March 9, 2007, a proposed revised pre-trial schedule, including Plaintiffs' time to file the Consolidated Class Action Complaint.


SO ORDERED:

DATED:    New York, New York
          February 27, 2007

LORETTA A. PRESKA, U.S.D.J.


42