USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ______
DATE FILED: 10/9/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------x

IN RE DIGITAL MUSIC ANTITRUST LITIGATION

THIS DOCUMENT RELATES TO: ALL ACTIONS

-------------------------------x

06 MDL No. 1780 (LAP)

OPINION

LORETTA A. PRESKA, U.S.D.J.

This multidistrict litigation involves allegations that Bertelsmann, Inc., SONY BMG Music Entertainment, Sony Corporation of America, Capitol Records, Inc. dba EMI Music North America, EMI Group North America, Inc., Capitol-EMI Music, Inc., Virgin Records America, Inc., Time Warner Inc., UMG Recordings, Inc., and Warner Music Group Corp. (collectively, "Defendants") conspired to fix or maintain artificially the prices of Digital Music. Plaintiffs are fifteen individuals (collectively, "Plaintiffs") from nine states who seek to represent a putative nation-wide class of purchasers of Digital Music. Defendants move [dkt. no. 75] to dismiss the Second Consolidated Amended Complaint ("SCAC") under Rule 12(b)(6) of the Federal Rules of Civil Procedure and, in the alternative, to strike certain portions of the SCAC pursuant to Rule 12(f).[1]

---

[1] The parties have submitted the following briefs in connection with Defendants' motion to dismiss: Defendants' Joint

(*continued on next page*)

Plaintiffs move [dkt. no. 104] to amend one paragraph of the SCAC to add certain allegations.[2] For the reasons that follow, Defendants' motion is GRANTED, and Plaintiffs' motion is DENIED.

## I. BACKGROUND

According to the SCAC, Digital Music is music that is manufactured as a digital file. (See SCAC ¶ 2, In re Digital Music, 06 MDL. 1780 (filed June 13, 2007) (hereinafter "SCAC").) It is delivered in two allegedly interchangeable formats: on compact discs ("CDs") and through the internet ("Internet Music"). (See id. ¶ 41.) The SCAC defines the relevant market in this action as the market for sales of all Digital Music (both CDs and Internet Music) in the United States; Defendants, described as the four largest record companies in the United

---

*(continued from previous page)*

Memorandum of Law in Support of Motion to Dismiss and to Strike Portions of Plaintiffs' Second Consolidated Amended Complaint ("Defs.' Mem."); Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss and to Strike Portions of Plaintiffs' Second Consolidated Amended Complaint ("Pls.' Opp'n"); and Defendants' Reply Memorandum of Law in Further Support of Motion to Dismiss and to Strike Portions of Plaintiffs' Second Consolidated Amended Complaint ("Defs.' Reply").

[2] The parties have submitted the following briefs in connection with Plaintiffs' motion to amend: Plaintiffs' Memorandum of Law in Support of Their Motion for Leave to Amend Paragraph 99 of the Complaint (Pls.' ¶ 99 Mem."), and Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion to Amend Paragraph Ninety-Nine (99) of the Second Consolidated Amended Complaint ("Defs.' ¶ 99 Opp'n").

States, allegedly control in excess of 80% of that market. (See id. ¶ 40.)

In general, the SCAC alleges that Defendants conspired to inflate and maintain at supracompetitive levels the price of Digital Music. (See id. ¶ 126.) They achieved this by fixing a high price for and restraining the availability of Internet Music (id. ¶ 66), which, in turn, buoyed the price of CDs "despite declining costs of production associated with the introduction of new technologies" (id. ¶ 126; see also id. ¶ 105). Explains the SCAC: "[a]cting alone, no defendant could sustain the supracompetitive prices for CDs prevailing in the market. This inability to charge high CD prices, as market factors made consumer demand for CDs more elastic over time at the prices charged by Defendants during the conspiracy, gave Defendants motive to conspire." (Id. ¶ 83.)

Defendants' manipulation of the market for Internet Music is described in two phases of conduct. The first phase centers on two joint ventures -- "MusicNet" and "pressplay" -- created by Defendants to distribute their Internet Music. (Id. ¶ 67.)[3] The second phase alleges manipulation through Defendants' business dealings with third-party licensees. (Id. ¶ 99.)

[3] The SCAC alleges that Defendants Bertelsmann, WMG and EMI launched MusicNet, while UMG and Sony launched "pressplay," originally called "Duet." (SCAC ¶¶ 67, 72.)

A. The First Phase: The Joint Ventures

The SCAC appears to include principally two allegations concerning the joint ventures. First, it alleges that the joint ventures directly restricted the wide-spread distribution and use of Internet Music by charging supracompetitive prices and imposing unpopular digital rights management ("DRM") rules on the Internet Music they sold to consumers. (Id. ¶¶ 75-78; see id. ¶ 81 ("Defendants collectively refused to utilize or license a system that was convenient, not burdened with use restrictions and competitively priced.").)[4] According to the SCAC, Defendants enforced those price and use restrictions through their use of most-favored nations clauses ("MFNs") and "side agreements," whereunder each Defendant would license its songs to the joint ventures at a price not lower than the price secured by any other Defendant. (Id. ¶¶ 92-94, 96-97.)[5] Thus, "Defendants'

[4] "Digital rights management" refers to the restrictions on a consumer's use of Internet Music. (See SCAC ¶ 75.) The SCAC also notes that the joint ventures allowed Defendants "to engage in the anticompetitive practice of tying or 'bundling' Internet Music onto a single online 'album.'" (Id. ¶ 84.)

[5] The SCAC alleges that, at the same time Defendants licensed their music to the joint ventures, they also licensed it to third-party vendors. The SCAC notes that Defendants also enforced their agreement during the joint venture phase by imposing the same price and use restrictions on the third party licensees and, further, by penalizing such licensees with higher prices or license termination if they dealt with other record labels. (Id. ¶ 79.)

collusion in setting high prices for Internet Music, as well as their collusion in imposing unfair and one-sided terms on its use, made Internet Music less attractive to consumers, allowing Defendants to sell CDs at supracompetitive prices." (Id. ¶ 82.)

Second, the SCAC alleges that the joint ventures were shams that were designed solely to "provide[] Defendants with opportunities and forums to meet and further conspire to cooperate to maintain the prices and terms for Internet Music." (Id. ¶ 87.) This follows, alleges the SCAC, from the fact that certain aspects of the joint ventures' business model were contrary to the economic self-interests of each individual Defendant. Thus, "[a]ny one of the Defendants might have removed these unpopular DRM and gained additional market share and profits and most or all would have but for the conspiracy, just as independent labels not party to the conspiracy sell DRM-free Internet Music." (Id. ¶ 76; see also id. ¶ 78 ("[R]ather than pursue their individual interests by competing with each other, the new method of distribution was used as a pretext for Defendants to meet and conspire.").) Plaintiffs allege that the same was true of the way Defendants structured their compensation from the joint ventures: because Defendants were not paid on a per-song basis, their "economic incentives were to charge monopoly prices for Internet Music rather than compete with one another on price." (Id. ¶ 89.) Thus, instead of

legitimate business entities, the joint ventures were merely "vehicles through which the Defendants effectively exchanged price information, policed their cartel and imposed restrictive licensing arrangements that retarded the growth of Internet Music." (Id. ¶ 98.)[6]

The SCAC further alleges that Defendants attempted to conceal many of the joint ventures' allegedly anticompetitive practices. (Id. ¶ 113.) For instance, Defendants -- through the joint ventures -- allegedly "conspired to mask their anticompetitive conduct by pretextually establishing rules to prevent antitrust violations, ignoring them, and then using these sham rules to convince the United States Department of Justice [("DOJ")] to drop the investigation it launched in 2001." (Id. ¶¶ 90, 91.) Defendants also allegedly attempted to conceal the use of MFNs in their agreements with the joint ventures because "they knew they would attract antitrust scrutiny by DOJ and others" (id. ¶ 93); one such MFN -- between EMI and MusicNet -- was allegedly memorialized as a "side-letter" agreement "because 'there are legal/antitrust reasons

---

[6] The SCAC also alleges that the Recording Industry Association of America ("RIAA"), allegedly the main industry trade association and under Defendants' control, "provides another forum and means through which Defendants can communicate about the pricing, terms and use restrictions they collectively agree upon with respect to Internet Music." (SCAC ¶ 88.)

why it would be a bad idea to have MFN clauses in any, or certainly all, of these agreements'" (id. ¶¶ 94-95).

B. The Second Phase: Third-Party Licensees

According to the SCAC, Defendants also manipulated the market for Internet Music through their direct dealings with third-party licensees. (Id. ¶ 99.) Defendants allegedly set a "wholesale price floor at 70 cents per song [and] placed restrictions on the use of Internet Music that unreasonably limit its utility and attractiveness to purchasers." (Id. ¶ 100). Agreement as to the price floor is demonstrated, argue Plaintiffs, by the fact that, in May 2005, Defendants each raised their price for Internet Music from approximately 65 cents to 70 cents. (See Pls.' ¶ 99 Mem. Ex. A (Proposed Third Amended Complaint).) As was the case with the joint ventures, Defendants allegedly enforced this price floor by requiring third-party licensees to sign MFNs specifying that each licensee must pay each Defendant no less than it pays other Defendants. (SCAC ¶ 99.)

The SCAC describes the experience of eMusic, allegedly the "most popular online music service that sells Internet Music owned by independent labels" (id. ¶ 103), which sells Internet Music for only $0.25 per song without any DRM restrictions (id. ¶ 103). According to the SCAC, Defendants refused to do

business with eMusic, despite the fact that it is "the #2 Internet Music retailer" (id. ¶ 104) because eMusic refused to impose the same Internet Music price and use restrictions as Defendants (id.). According to the SCAC, such uniform behavior is consistent only with prior agreement: "[a]bsent an agreement not to compete with each other, Defendants would try to gain advantages over each other by selling Internet Music with fewer unpopular restrictions; hence the lack of such competition on price or quality shows continuing collusion." (Id. ¶ 102.)

In addition to this conduct, the SCAC also notes that Defendants either are or were under investigation for certain conduct by various governmental agencies. For instance, Defendants' price fixing is the subject of an investigation by the Office of the New York State Attorney General (id. ¶ 106), and, in 2006, the DOJ "opened an investigation into collusion and price fixing of Internet Music by the Defendants" (id. ¶¶ 107-08). Defendants were also allegedly "subject to a number of government investigations and lawsuits concerning the pricing of CDs" (id. ¶ 110) and settled claims by the New York Attorney General and the FCC concerning Defendants' purported "schemes of paying radio stations for playing certain songs" (id. ¶ 111).

## II. DISCUSSION

The SCAC includes three counts for relief. Count One alleges violations of § 1 of the Sherman Antitrust Act. See 15 U.S.C. § 1 (2000); see also SCAC ¶¶ 123-34. Count Two alleges violations of various state antitrust and consumer protection laws (SCAC ¶ 136(a)-(u)), and Count Three alleges unjust enrichment also under the laws of various states (id. ¶¶ 138-45). In their motion, Defendants argue principally that the SCAC fails to state a § 1 claim under the Supreme Court's recent decision in Bell Atlantic v. Twombly, 127 S.Ct. 1955, 1969 (2007); see also Defs.' Mem. 7. They argue that the state antitrust claims must also be dismissed for that reason (see Defs.' Mem. 24 n.14) and that the consumer protection and unjust enrichment claims fail for various reasons (see id. at 24-28, 30-32, 34-38). Because so much of this motion involves the pleading requirements after Twombly, I begin my discussion there.

### A. The Sherman Act Count

#### 1. Pleading Standards After Twombly

Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." On a Rule 12(b)(6) motion to dismiss, it is well-settled that a court must accept all factual allegations in the complaint as true,

Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993), and afford the plaintiff every reasonable inference, see Zinermon v. Burch, 491 U.S. 113, 118 (1990).

It was once similarly well-settled that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The Supreme Court retired that language in Twombly, however, instead holding that:

> [w]hile a complaint attacked on a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

Twombly, 127 S.Ct. at 1964-65 (internal quotation marks and citations omitted). Thus, while Twombly did "not require heightened fact pleading of specifics," it did require that a pleading include "enough facts to state a claim to relief that is plausible on its face." Id. at 1974.

To fully appreciate the significance of Twombly, it is necessary to understand the antitrust context in which it was decided. Because § 1 of the Sherman Act reaches only those

restraints of trade effected by "contract, combination or conspiracy," see 15 U.S.C. § 1; see also Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761 (1984) (§ 1 of the Sherman Act incorporates the "basic distinction between concerted and independent action"), it is fundamental that a § 1 claim allege "some form of concerted action between at least two legally distinct economic entities." Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 95-96 (2d Cir. 1998); see also Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 775-76 (1984) ("[T]his Court has recognized that § 1 is limited to concerted conduct at least since [1919]."). While such concerted action need not result from explicit agreement, see United States v. Gen. Motors Corp., 384 U.S. 127, 142-43 (1966), a § 1 violation based on "tacit collusion" or "conscious parallelism"[7] requires more than a bare showing of parallel conduct. See, e.g., Theatre Enters., Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 541 (1954) ("[T]his Court has never held that proof of parallel business behavior conclusively establishes agreement or, phrased differently, that such behavior itself constitutes a Sherman Act

[7] Those terms describe the process "by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions." Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227 (1993).

offense. . . . '[C]onscious parallelism' has not yet read conspiracy out of the Sherman Act entirely."); see also Twombly, 127 S.Ct. at 1964 ("The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market."). Instead, under those circumstances, "there must be evidence that tends to exclude the possibility of independent action." Monsanto, 465 U.S. at 768; see also Theatre Enters., 346 U.S. at 540 ("The crucial question is whether [a defendant's] conduct . . . stemmed from independent decision or from an agreement, tacit or express."). Thus was born the jurisprudence of "plus factors" -- the additional circumstantial evidence, beyond parallel conduct, that must exist to ensure "that the inference of conspiracy is reasonable in light of the competing inferences of independent action." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986); see also ABA Section of Antitrust Law, Antitrust Law Developments 11 n.57 (6th ed. 2007); 6 Philip Areeda & Herbert Hovenkamp, Antitrust Law §§ 1434(a)-(e) (2d ed. 2003) ("Areeda & Hovenkamp").

Whatever those "plus factors" or "factual enhancements" may be, suffice it to say for present purposes that, after Twombly,

they must appear in a § 1 plaintiff's complaint. As the Court noted, in the antitrust context:

> [a] statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory. An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of "entitle[ment] to relief."

Twombly, 127 S.Ct. at 1966 (citation omitted). Rather, the Court held that "stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." Id. at 1965.

2. Assessing the SCAC After Twombly

At its heart, the SCAC alleges that Defendants imposed the same price and use restrictions on their sale of Internet Music to make that means of delivery of Digital Music less attractive to consumers, thereby buoying the prices of CDs.[8] Plaintiffs

---

[8] Plaintiffs do not argue that the joint ventures themselves violate the antitrust laws: "[I]t is not the existence or creation of these joint ventures that form the basis of the Plaintiffs' allegations. Rather, Plaintiffs allege that Defendants . . . used those ventures as a means to implement their anticompetitive agreements." Pls.' Supp. Opp'n 10; see also Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752,

(*continued on next page*)

advance essentially three arguments to support an inference that Defendants' parallel conduct resulted from an agreement: (a) that Defendants' creation of and participation in the joint ventures makes plausible the inference that their subsequent parallel conduct was the result of an agreement; (b) that further factors -- acts against Defendants' economic self-interests, motive to conspire, suspicious price increases, Defendants' "antitrust record" and opportunities to conspire through the RIAA (see Pls.' Opp'n 9-12) -- indicate that Defendants' parallel conduct resulted from agreement; and (c) that certain economic indicators -- market concentration and high barriers to market entry -- are sufficient to ground a § 1 conspiracy (see id. at 8-9, 11). I discuss each individually below and, affording Plaintiffs every reasonable inference, see Zinermon, 491 U.S. at 118, conclude that the further facts alleged by Plaintiffs, considered alone and collectively, do not place Defendants' conduct "in a context that raises a suggestion of a preceding agreement." Twombly, 127 S.Ct. at 1966. Therefore, Plaintiffs fail to state a claim for relief under § 1 of the Sherman Act and Count 1 of the SCAC must be DISMISSED.

---

*(continued from previous page)*

768 (1984) (noting that joint ventures who "hold the promise of increasing a firm's efficiency and enabling it to compete more effectively" are reviewed under the rule of reason).

a. The Joint Ventures

Because Plaintiffs do not challenge the legality of the joint ventures themselves, it is somewhat unclear how they contend those ventures support an inference of agreement. They appear to argue that the creation and operation of the joint ventures yields an inference of agreement because those ventures were mere sham organizations designed solely to provide a forum in which to discuss and agree to the terms of the later agreement.

To begin, the bald allegation that the joint ventures were shams is conclusory and implausible. It ignores the context in which those entities were created: an environment of widespread unauthorized downloading of Internet Music. (See, e.g., Almedia Decl. Ex. B (Bulcao Compl.) ¶ 37 ("The distribution of digital music exploded in the late 1990s with the emergence of Napster, the most popular online music service (which had tens of millions of users) Kazaa and other services offering free peer to peer file sharing, i.e., the ability of one person to share Online Music with anyone else via a website . . . . Napster initially provided file sharing for free . . . .").)[9] As a

[9] I may consider the Bulcao complaint as a predecessor to the SCAC. See United States v. GAF Corp., 928 F.2d 1253, 1259

(*continued on next page*)

result of that unauthorized downloading, "the major recording companies that control the copyrights to most popular music [were] generally unwilling to license their music for online sale except in protected formats." (See id. Ex. C (Tucker Compl.) ¶¶ 33-34.)[10] Viewed in that context, each reason offered by Plaintiffs to support their sham allegation has an entirely reasonable independent justification: "unpopular" use restrictions and compromise in the collaboration's pricing structure are each consistent with a collaborative effort to address widespread music piracy. In the absence of any formal veil-piercing allegations and without challenging the legality of those joint ventures under the antitrust laws, Plaintiffs cannot now call into question their legitimacy simply by describing conduct consistent with rational business decisions. For that reason alone, I could decline to infer that the joint ventures were vehicles to create an antitrust conspiracy.

---

*(continued from previous page)*

(2d Cir. 1991) ("[T]he law is quite clear that superseded pleadings in civil cases may constitute admissions of party opponents, admissible in the case in which they were originally filed, as well as any subsequent litigation involving that party." (citing United States v. McKeon, 738 F.2d 26, 31 (2d Cir. 1984))).

[10] I am permitted to take judicial notice of the Tucker complaint under Rule 201(b) of the Federal Rules of Evidence. See Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991).

There is a further reason, however, not to draw such a negative inference. It is common sense that some level of information sharing must inevitably occur in the operation of a joint venture. As Judge Marilyn Hall Patel recently observed in a passage upon which Plaintiffs rely, "even a naïf must realize that in forming and operating a joint venture, [record label] representatives must necessarily meet and discuss pricing and licensing." In re Napster, Inc. Copyright Litig., 191 F. Supp. 2d 1087, 1109 (N.D. Cal. 2002). Judge Patel drew a negative inference from the possibility of such communication, allowing further discovery into Napster's allegation that the joint ventures themselves violated the antitrust laws. See id. at 1108-10. Of course, Plaintiffs offer no direct challenge to the joint ventures here. This situation is, therefore, more like the situation in Twombly, where the Supreme Court declined to draw a negative inference from allegations of information sharing that resulted from defendants' participation in a concededly legal industry trade group. See 127 S.Ct. at 1971 n.12. It is similarly unwarranted to draw a negative inference from allegations involving the unchallenged collaboration between and among Defendants.[11]

[11] Plaintiffs' allegation that Defendants "conspired to mask their anticompetitive conduct by pretextually establishing rules

(*continued on next page*)

A more subtle argument could be made that a later illegal tacit agreement can be inferred from the fact of Defendants' explicit prior agreement with materially the same terms, reached in the context of the joint ventures. What scarce authority there is on this issue -- the parties have cited no reported decision, and research has disclosed but one -- does not address the precise issue. See United States v. Nat'l Malleable & Steel Castings Co., Civ. No. 30,281, 1957 U.S. Dist. Lexis 4209, 1957 Trade Cas. ¶ 68,890 (N.D. Oh. Nov. 26, 1957), affirmed, 358 U.S. 38 (1958) (mem.). In the Steel Castings case, the court confronted a price-fixing conspiracy that was alleged to have existed after defendants discontinued a trust agreement among themselves. See id. at *10-12. Though its legality was unchallenged, all appear to have agreed that the prior trust agreement was discontinued because it would have been considered illegal under then-recent changes in the law. See id. at *12. The court refused to conclude that the prior trust agreement was illegal; the court further refused to conclude that the prior agreement had "ended only in its outward manifestations" based

---

*(continued from previous page)*

to prevent antitrust violations" (SCAC ¶ 90) is wholly conclusory. Further, I decline to infer that the joint ventures were designed to hide a true purpose of information sharing simply because Defendants structured them so as to comply with the antitrust laws.

on certain economic evidence and other testimony about the market in question. See id. at *19-20.[12]

I conclude that an inference of subsequent agreement based on prior, unchallenged explicit agreement is unreasonable. By not challenging the legality of the joint ventures, Plaintiffs concede the possibility that Defendants, acting collectively through the joint ventures, were permissibly motivated in imposing the price and use restrictions in question. Cf. U.S. Dep't of Just. & Fed. Trade Comm'n, Antitrust Guidelines for Collaborations Among Competitors 5-6 (2000) (recognizing that joint ventures offer significant pro-competitive benefits). Conceding that possibility, it is just as likely that each Defendant was motivated on its own by the same permissible impulses that motivated the group as a collective, and Plaintiffs offer nothing now to create a reasonable inference that Defendants were not so motivated.[13]

---

[12] Some guidance may also be taken from the cases limiting the inference that may be drawn from allegations of antitrust conspiracy in other markets, see, e.g., Matsushita, 475 U.S. at 595-96, or from commentary recognizing the limits of allegations of earlier conspiracy in the same market, see 6 Areeda & Hovenkamp, supra, § 1421b(3). Of course, the inference of agreement is weaker here a fortiori because Plaintiffs do not claim that the joint ventures were illegal.

[13] Inertia is yet another possible explanation for Defendants' parallel conduct that does not implicate prior agreement. As Areeda and Hovenkamp discuss, parallel conduct can just as

(*continued on next page*)

For these reasons, I reject as unreasonable Plaintiffs' invitation to infer that Defendants' subsequent adoption of parallel price and use restrictions resulted from agreement based on their creation of or membership in the unchallenged joint ventures.

b. Other Circumstantial Evidence

The other circumstances alleged by Plaintiffs are similarly equivocal and do not justify the inference that Defendants' parallel conduct resulted from agreement. For instance, Plaintiffs' allegation of a "motive to conspire" is nothing more than an assertion of interdependence. Plaintiffs contend that Defendants possessed such a motive because they understood that price competition among them would only drive down the price of Digital Music. (See SCAC ¶ 83.) There is no agreement, however, merely because an oligopolist charges an inflated price knowing (or even hoping) that other oligopolists will match his high price. Such is bald conscious parallelism, and, as the Supreme Court has stated, "parallel conduct, even conduct consciously undertaken," does not itself state an antitrust conspiracy. See

---

*(continued from previous page)*

easily result from convention, under which circumstances an inference of prior agreement is illogical. See 6 Areeda & Hovenkamp, supra, § 1410c (quoting and discussing D. Lewis, Convention: A Philosophical Study (1969)).

Twombly, 127 S.Ct. at 1966; see also 6 Areeda & Hovenkamp, supra, § 1433 (surveying cases); id. § 1432a (concluding that no agreement exists "merely from recognized interdependence without the addition of any facilitators").

As noted above, the Supreme Court observed in Twombly that the mere participation in an industry trade association would not yield an inference of improper inter-firm communication. See 127 S.Ct. at 1971 n.12. Plaintiffs' allegation concerning the RIAA in this action suffers a similar fate. That fact is, at best, neutral and thus adds nothing that would "'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007) (quoting Twombly, 127 S.Ct. at 1974).

Plaintiffs' allegation that Defendants' "antitrust record" supports an inference of agreement is even less helpful. First, Plaintiffs overstate the weight that should be afforded to such evidence. See 6 Areeda & Hovenkamp, supra, § 1421b(1) ("prior conspiracy is not alone probative of present collusion"); Richard A. Posner, Antitrust Law 79 (2d ed. 2001) (antitrust record of an industry is useful to help enforcement agencies target limited resources). Indeed, as one commentator has suggested, "caution is required lest the defendants' demonstrated moral infirmities distract the court's attention from the distinction between tacit coordination through mere

interdependence and traditional conspiracy." 6 Areeda & Hovenkamp, supra, § 1421b(2). Still greater caution is required here, where the alleged "antitrust record" hardly illustrates any "demonstrated moral infirmities." As at least one other court has noted, mere investigation by governmental agencies does not show an "antitrust record." See In re Graphics Processing Units Antitrust Litig., 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (investigation alone "carries no weight in pleading an antitrust conspiracy claim"). Moreover, the investigations alleged here do not support the inference Plaintiffs urge: the DOJ closed its investigation after it "uncovered no evidence that the major record labels' joint ventures have harmed competition or consumers of digital music" (Almeida Decl. Ex. 5 (DOJ Press Release)), and the relevance of the New York State Attorney General's payola investigation is not apparent. Such an "antitrust record" cannot justify the already problematic inference that "once a criminal, always a criminal."

Plaintiffs' conclusion that the imposition of price and use restrictions was against Defendants' economic self-interests is implausible and, likewise, cannot support an inference of agreement. As discussed above, the imposition of use restrictions was, in fact, not contrary to Defendants' collective economic self-interests when viewed against the

backdrop of widespread unauthorized music downloading. (See supra 15-17.) That observation remains true for each individual Defendant. Indeed, contrary to Plaintiffs' suggestion, the unpopularity of Defendants' Internet Music use restrictions with consumers is hardly reflective of each Defendant's economic self-interest. (See SCAC ¶ 76 ("Any one of the Defendants might have removed these unpopular DRM and gained additional market share and profits . . . .").) Surely, any Defendant who decided to give its product away for free would have been popular with consumers, but refusing to do so is hardly the economically-irrational decision Plaintiffs portray it to be. Especially under the circumstances of widespread pirating, the fact that customers disliked each Defendant's attempt to secure its copyrights shows nothing. Nor do Plaintiffs derive support from the fact that the price for Defendants' Internet Music converged at a higher price than that charged by the independent music labels. It is beyond peradventure that different products will fetch different prices, and, though the parties have not briefed the issue of what price disparity would be reasonable here, I need not decide that issue to conclude that the mere existence of a disparity does not itself bespeak an act against self-interest.

Finally, Plaintiffs' ambiguous allegation of price increases does not support an inference of agreement because

that conduct, as alleged, is consistent with sequential parallelism.[14] As commentators note, "[n]o additional fact, such as advance agreement, is needed to explain that process," and, therefore, "agreement is ordinarily more difficult to infer from sequential actions." 6 Areeda & Hovenkamp, supra, § 1425d(1). On the other hand, an inference of prior agreement may be warranted from simultaneous parallel price conduct where no actor had prior knowledge of or time to consider the other actors' conduct. See Taxi Weekly, Inc. v. Metro. Taxicab Board of Trade, Inc., 539 F.2d 907, 911-12 (2d Cir. 1976) (inference of prior agreement justified where taxi fleet owners each called to cancel subscription to trade publication within one half hour of each other one day after meeting); see also 6 Areeda & Hovenkamp, supra, § 1425c. Here, Plaintiffs allege only that prices rose "in or about May 2005." Affording Plaintiffs every reasonable inference, Twombly nevertheless requires that they plead further facts tending to show conspiracy; "facts" such as these that are just as consistent with independent action are insufficient as a matter of law. See, e.g., Matsushita, 475 U.S. at 588 ("[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an

[14] Plaintiffs seek leave to amend SCAC Paragraph 99. Because I conclude that their proposed amendment would be futile, leave to amend is DENIED. See Foman v. Davis, 371 U.S. 178, 182 (1962); Jin v. Metro. Life Ins. Co., 310 F.3d 84, 101 (2d Cir. 2002).

inference of antitrust conspiracy . . . ." (citing Monsanto, 465 U.S. at 764)).

c.   Economic Indicators

Finally, Plaintiffs suggest that the existence of certain economic indicators is sufficient to justify the inference that Defendants' parallel conduct resulted from agreement. (See Pls.' Opp'n 9.)  For this proposition, they rely principally on the work of Judge Richard A. Posner, who describes an approach to identifying and punishing tacit antitrust collusion based solely on economic evidence. See Posner, supra, at 69. That approach posits two sets of economic data:  indicators that "identif[y] those markets in which conditions are propitious for the emergence of collusion" and indicators that reveal "whether there really is collusive pricing in any of those markets." Id. The first set of indicators, while valuable to help enforcement agencies direct limited resources, see id. at 69, 79, do not show that the alleged conduct "stemmed from independent decision or from an agreement, tacit or express." Theatre Enters., 346 U.S. at 540.

Without reaching the question whether economic evidence

alone may be sufficient to support an inference of agreement,[15] Plaintiffs' attempt to do so here fails on its own terms. In this case, Plaintiffs allege only facts that would identify the market for Digital Music as one "in which conditions are propitious for the emergence of collusion."[16] (See SCAC ¶¶ 6 (high seller-side concentration), 47 (low buyer-side

[15] Judge Posner observes how judicial treatment of the "plus factors" analysis has often mistakenly demanded evidence of actual agreement: "[w]hat the cases seem to mean, however, and what some of them make explicit, is that there must be an explicit agreement based upon actual communication between the parties." See Posner, supra, at 94 (emphasis in original, footnote omitted); see id. at 99-100 (discussing language in Monsanto that aggravates judicial confusion regarding proof of tacit agreement). He argues against that requirement: "[i]f the economic evidence presented in a case warrants an inference of collusive pricing, there is neither legal nor practical justification for requiring evidence that will support the further inference that the collusion was explicit rather than tacit." See id. at 94.

[16] Plaintiffs allege that the Digital Music market is characterized by low buyer-side concentration because "there are thousands of class members." (See Pls.' Opp'n 9.) That assertion is undermined somewhat by the allegation elsewhere in the SCAC that Defendants sold largely to retailers (see SCAC ¶¶ 56-57, 79), a group as to whose size the SCAC is silent. Further, it is worth noting that SCAC's description of the market for Internet Music is inconsistent in some basic respects with the type of market Judge Posner describes as vulnerable to price collusion. That is to say, as it is described in the SCAC, the Internet Music market is not characterized by the relative inability of competitors to increase supply or decrease prices to challenge effectively the conspirators' market control, see Posner, supra, at 63-64, but rather as one where, for instance, eMusic was able to increase its "production" rapidly through relationships with "hundreds of independent record labels," sufficient even to surpass Defendants in the market (see SCAC ¶ 104).

concentration), 70-71 (similar cost structures among Defendants), 72 (industry-wide cooperative practices).)[17] As Judge Posner recognizes, however, those facts do not render plausible the inference of agreement among these Defendants: just because you grow up in a high crime area does not make you a criminal.

For the foregoing reasons, I conclude that the SCAC does not allege the further facts required by Twombly to state a § 1 claim based upon parallel conduct. Count One is, therefore, DISMISSED.

B. The State Antitrust and Consumer Protection Count

1. The State Antitrust Claims

As noted above, Count Two of the SCAC asserts claims under the antitrust laws of the following 16 jurisdictions: Arizona, California, Washington, D.C., Iowa, Kansas, Maine, Michigan,

[17] It should be noted that the paragraphs in the SCAC invoked to support the claim that Plaintiffs have pleaded high barriers to market entry (see Pls.' Opp'n 11 (citing SCAC ¶¶ 55-57)) do not mention barriers to market entry. Paragraph 55 states: "Defendants have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole." Paragraphs 56 and 57 duplicate each other, and state: "Defendants produce, license and distribute Digital Music, including Internet Music and CDs, to retailers for sale throughout the United States and in some instances sell Internet Music and CDs directly to consumers through Internet sites, record clubs and other entities which they own or control."

Minnesota, Nevada, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin.[18] Defendants argue that those claims must be dismissed for the same reason as the federal claim. I agree.

At its heart, Twombly is a decision about the Federal Rules of Civil Procedure: to survive a Rule 12(b)(6) motion to dismiss, a pleading must include allegations that make its claim for relief plausible, not merely possible. See 127 S.Ct. at 1974 (pleading must include "enough facts to state a claim to relief that is plausible on its face"). That purely procedural standard of pleading binds this Court's evaluation of state law claims, see, e.g., 5B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2008), and, while it

[18] Paragraph 136(n) of the SCAC purports to assert claims under the "New York common law against restraints of trade." New York law includes an antitrust provision, called the Donnelly Act. See N.Y. Gen. Bus. Law § 340 et seq. (McKinney 2004). Nevertheless, Plaintiffs state that it is not their intention to bring any claim under that Act (see Pls.' Opp'n 29 n.29); and they do not discuss or even identify the distinct "common law against restraints of trade" upon which to base their claim. Therefore, to the extent the SCAC asserts claims under New York law apart from its claims under New York's Consumer Protection from Deceptive Acts and Practices provisions, see N.Y. Gen. Bus. Law § 346 (McKinney 2004), those claims are DISMISSED. In any event, the substantive provisions of the Donnelly Act mirror federal antitrust law, see, e.g., State v. Mobil Oil Corp., 38 N.Y.2d 460, 463, 344 N.E.2d 357, 359 (1976); Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC, 317 F. Supp. 2d 301, 333 (S.D.N.Y. 2003), and, thus, any New York antitrust claims would be dismissed for the same reasons as were the federal and other state antitrust claims.

has caused much ado in the legal community, see, e.g., Iqbal v. Hasty, 490 F.3d 143, 155 (2d Cir. 2007) (finding "[c]onsiderable uncertainty concerning the standard for assessing the adequacy of pleadings" after Twombly), it did not alter the substantive federal law of antitrust: parallel conduct alone, even if consciously undertaken by individual firms, does not constitute a conspiracy to restrain trade in violation of § 1 of the Sherman Act. The question, therefore, is not whether the relevant state courts would decide Twombly the same way but, rather, whether the state's antitrust law incorporates the same substantive principle of federal antitrust law regarding conscious parallelism.

I answer this question in the affirmative for several reasons. First, some courts have explicitly adopted, as a matter of state substantive antitrust law, the federal approach to the question of whether consciously parallel conduct alone constitutes an antitrust conspiracy.[19] Second, several states'

[19] See Aguilar v. Atl. Richfield Co., 25 Cal. 4th 826, 851-52, 24 P.3d 493, 511-12 (2001) ("Ambiguous evidence or inferences showing or implying conduct that is as consistent with permissible competition by independent actors as with unlawful conspiracy by colluding ones do not allow such a trier of fact [to find an unlawful conspiracy]." (citing Areeda & Hovenkamp)); Pease v. Jasper Wyman & Son, 00 Civ. 15, 2002 WL 1974081, at *11-12 (Me. Super. Ct. Aug. 9, 2002); Desgranges Psychiatric Ctr., PC v. Blue Cross & Blue Shield of Mich., 124 Mich. App. 237, 244-45, 333 N.W.2d 562, 565 (Mich. Ct. App. 1983)

(*continued on next page*)

antitrust statutes explicitly direct state courts to consider, as persuasive or controlling authority, federal court decisions construing the federal antitrust laws.[20] Third, even absent such

(*continued from previous page*)

("A unilateral action, no matter how anticompetitive it may be, does not amount to a combination to restrain trade.") (citing Theatre Enters., 346 U.S. at 537); Wrensch v. Assoc. Milk Producers, Inc., No. 78-131, 1979 WL 30778, at *6 n.21 (Wis. Ct. App. 1979) ("We recognize that similar practices by competitors, i.e., 'conscious parallelism,' will sometimes support an inference of an agreement. Only where the pattern of action undertaken is inconsistent with the self-interest of the individual actors, were they acting alone, may an agreement be inferred solely from such parallel action." (quotation marks omitted)); State v. Heritage Realty of Vermont, 137 Vt. 425, 429-30, 407 A.2d 509, 511-12 (1979) ("Price uniformity among competitors does not, of itself, violate the antitrust laws, however. If it is the result of independently reached pricing decisions, the element of 'agreement' necessary to establish an illegal price-fixing combination or conspiracy is absent." (citations omitted)).

[20] See Ariz. Rev. Stat. § 44-1412 (2008) ("It is the intent of the legislature that in construing this article, the courts may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes."); D.C. Code § 28-4515 (2008) ("It is the intent of the Council of the District of Columbia that in construing this chapter, a court of competent jurisdiction may use as a guide interpretations given by federal courts to comparable antitrust statutes."); Iowa Code § 553.2 (2008) ("This chapter shall be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purpose as this chapter."); Mich. Comp. Laws 445.784(2) (2008) ("It is the intent of the legislature that in construing all sections of this act, the courts shall give due deference to interpretations given by the federal courts to comparable antitrust statutes . . . ."); Nev. Rev. Stat. § 598A.050 (2008) ("The provisions of this chapter shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes."); S.D. Codified Laws § 37-1-22 (2008) ("It is the intent of the Legislature that in construing

(*continued on next page*)

a statutory mandate, the courts in each jurisdiction overwhelmingly look to federal antitrust decisions to construe their own antitrust statutes.[21] It is irrelevant that states

(*continued from previous page*)

this chapter, the courts may use as a guide interpretations given by the federal or state courts to comparable antitrust statutes."); W.Va. Code § 47-18-16 (2008) ("This article shall be construed liberally and in harmony with ruling judicial interpretations of comparable federal antitrust statutes.").

[21] The following authorities are organized by jurisdiction. Arizona: See Johnson v. Pac. Lighting Land Co., 817 F.2d 601, 604 (9th Cir. 1987) (noting that "United States Supreme Court Sherman Act decisions [are] used to construe Arizona antitrust statute") citing Three Phoenix Co. v. Pace Indus., Inc., 135 Ariz. 113, 659 P.2d 1258, 1260 (1983))); see also Brooks Fiber Commc'ns of Tucson, Inc. v. GST Tucson Lightwave, Inc., 992 F. Supp. 1124, 1130 (D. Ariz. 1997). California: See Corwin v. Los Angeles Newspaper Serv. Bureau, Inc., 4 Cal. 3d 842, 852, 484 P.2d 953, 959 (1971) ("Sections 16720 and 16726 of the Cartwright Act were patterned after the Sherman Act and decisions under the latter act are applicable to the former."); see also County of Tuolumne v. Sonora Cmty. Hosp., 236 F.3d 1148, 1160 (9th Cir. 2001) (dismissing state antitrust claims because "[t]he analysis under California's antitrust law mirrors the analysis under federal law because [it] was modeled after the Sherman Act" (citing Mailand v. Burckle, 20 Cal. 3d 367, 375, 572 P.2d 1142, 1147 (1978))). District of Columbia: See WAKA LLC v. DC Kickball, 517 F. Supp. 2d 245, 252 (D.D.C. 2007) (failure to state a claim under § 1 equated to failure to state a claim under D.C. antitrust provision); GTE New Media Servs., Inc. v. Ameritech Corp., 21 F. Supp. 2d 27, 45 (D.D.C. 1998) ("The only difference between the two statutes is that the D.C. Code does not require an interstate nexus, but rather a connection within this jurisdiction."); Mazanderan v. Indep. Taxi Owners' Assoc., Inc., 700 F. Supp. 588, 591 n.9 (D.D.C. 1988) ("Analysis of plaintiff's state antitrust claim necessarily follows that of the federal claim . . . ."). Iowa: See Davies v. Genesis Med. Ctr. Anesthesia & Analgesia, P.C., 994 F. Supp. 1078, 1103 (S.D. Iowa 1998) ("When interpreting Iowa antitrust statutes, Iowa courts are required by section

(*continued on next page*)

(continued from previous page)

553.2 to give considerable weight to federal cases construing similar sections of the Sherman Act."); see also Fed. Land Bank of Omaha v. Tiffany, 529 N.W.2d 294, 296-97 (Iowa 1995) (federal decisions about whether farm credit banks are subject to federal antitrust laws was dispositive of same question under Iowa antitrust law). Kansas: See Orr v. Beamon, 77 F. Supp. 2d 1208, 1211-12 (D. Kan. 1999) ("While recognizing that federal antitrust cases are not binding on the court in interpreting Kansas antitrust statutes, the court finds such cases sufficiently persuasive to guide its decision . . . ."); Bergstrom v. Noah, 266 Kan. 829, 845, 974 P.2d 520, 531 (1999) ("While such cases may be persuasive authority for any state court interpreting its antitrust laws, such authority is not binding upon any court in Kansas interpreting Kansas antitrust laws."). Maine: See Davric Maine Corp. v. Rancourt, 216 F.3d 143, 149 (1st Cir. 2000) ("We have noted that the 'Maine antitrust statutes parallel the Sherman Act,' and thus have analyzed claims thereunder according to the doctrines developed in relation to federal law." (quoting Tri-State Rubbish, Inc. v. Waste Mgmt., Inc., 998 F.2d 1073, 1081 (1st Cir. 1993))). Michigan: See First Med Representatives, LLC v. Futura Med. Corp., 195 F. Supp. 2d 917, 922 (E.D. Mich. 2002) ("[B]ecause Michigan courts apply Sherman Act analysis to the MARA, the following analysis applies to the entirety of Count I, for the allegations of both state and federal antitrust violations." (citing Blair v. Checker Cab Co., 219 Mich. App. 667, 675, 558 N.W.2d 439 (Mich. Ct. App. 1996))); Danou v. Kroger Co., 557 F. Supp. 1266, 1268 (E.D. Mich. 1983) ("The Michigan antitrust statute is patterned after the Sherman Act. Accordingly, the federal courts' interpretations of the Sherman Act are persuasive authority as to the meaning of the Michigan Act.")(citing Goldman v. Loubella Extendables, 91 Mich. App. 212, 283 N.W.2d 695 (Mich. Ct. App. 1979)). Minnesota: See State by Humphrey v. Alpine Air Prods., Inc., 490 N.W.2d 888, 894 (Minn. Ct. App. 1992) ("Minnesota antitrust law should be interpreted consistently with federal court interpretations of the Sherman Act unless state law is clearly in conflict with federal law."); see also Lamminen v. City of Cloquet, 987 F. Supp. 723, 734 (D. Minn. 1997) (same). North Carolina: See Rose v. Vulcan Materials Co., 282 N.C. 643, 655, 194 S.E.2d 521, 530 (1973) ("[T]he body of law applying the Sherman Act, although not binding upon this Court in applying

(continued on next page)

(continued from previous page)

[North Carolina's antitrust law], is nonetheless instructive in determining the full reach of that statute."); see also United Roasters Inc. v. Colgate-Palmolive Co., 485 F. Supp. 1041, 1047-48 (C.D.N.C. 1979) ("[C]aution must be exercised in [taking guidance from Sherman Act decisions] because the Sherman Act is in some respects broader than [North Carolina's antitrust law]."). South Dakota: See Byre v. City of Chamberlain, 362 N.W.2d 69, 74 (S.D. 1985) ("[B]ecause of the legislative suggestion for interpretation found in SDCL 37-1-22, great weight should be given to the federal cases interpreting the federal statute."); see also In re S.D. Microsoft Antitrust Litig., 707 N.W.2d 85, 100 (S.D. 2005) (reiterating Byre); Assam Drug Co., Inc. v. Miller Brewing Co., Inc., 624 F. Supp. 411, 412 (D.S.D. 1985) ("[F]ederal court interpretations of the federal antitrust statutes may be used as a guide in interpreting the South Dakota statutes cited by plaintiffs in this case [and, therefore,] it is appropriate for correct analysis of the issues presented by this motion to refer to the relevant federal law."). Vermont: See State v. Heritage Realty of Vermont, 137 Vt. 425, 429-30, 407 A.2d 509, 511-12 (1979) (analyzing claim under Vermont antitrust law exclusively by reference to federal court Sherman Act decisions). West Virginia: See Kessel v. Monongalia County Gen. Hosp. Co., 220 W.Va. 602, 610, 648 S.E.2d 366, 374 (2007) ("[T]he Legislature has directed that the [West Virginia antitrust law] 'shall be construed liberally and in harmony with ruling judicial interpretations of comparable federal antitrust statutes.' Moreover, this Court held . . . that '[t]he courts of this state are directed by the legislature . . . to apply the federal decisional law interpreting the Sherman Act . . . to our own parallel antitrust statute." (citations omitted)). Wisconsin: See State v. Waste Mgmt. of Wis., Inc., 81 Wis. 2d 555, 574, 261 N.W.2d 147, 155 (1978) ("Except for the fact that the state act applies to intrastate commerce while the federal act applies to interstate commerce, what amounts to a conspiracy in restraint of trade under the Sherman Act amounts to a conspiracy in restraint of trade under the Wisconsin antitrust act."); see also Indep. Milk Producers Co-op v. Stoffel, 102 Wis. 2d 1, 6, 298 N.W.2d 102, 104 (Wis. Ct. App. 1980) ("[The Wisconsin Antitrust law] is drawn largely from federal antitrust law. Interpretation of [the Wisconsin law], prohibiting conspiraciesin restraint of trade or commerce, is controlled by federal case law." (citing Grams v. Boss, 97 Wis. 2d 332, 346, 294 N.W.2d 473, 480 (1980))).

have declined to follow federal antitrust law for the proposition that indirect purchasers lack standing to sue. See Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977). As the Supreme Court of Iowa explained:

> The purpose behind both state and federal antitrust law is to apply a uniform standard of conduct so that businesses will know what is acceptable conduct and what is not acceptable conduct. To achieve this uniformity or predictability, we are not required to define who may sue in our state courts in the same way federal courts have defined who may maintain an action in federal court.
>
> . . .
>
> Harmonizing our construction and interpretation of state law as to what conduct is governed by the law satisfies the harmonization provision.

Comes v. Microsoft Corp., 646 N.W.2d 440, 446 (Iowa 2002); accord Hyde v. Abbott Labs., Inc., 123 N.C. App. 572, 579, 473 S.E.2d 680, 685 (N.C. Ct. App. 1996) (declining to follow Illinois Brick for other reasons). That is to say, disagreement about who can sue does not entail disagreement about when they may recover. Finally, however, the simple fact remains that each state statute requires some form of agreement,[22] and

[22] See Ariz. Rev. Stat. § 44-1402 (prohibiting "[a] contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce"); Cal. Bus. & Prof. Code § 16720 (2008) ("A trust is a combination of capital, skill or acts by two or more persons for any of the following purposes."); D.C. Code § 28-4502 (prohibiting "[e]very contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce."); Iowa Code § 553.4 ("A contract, combination, or conspiracy between two or

(*continued on next page*)

independently undertaken parallel conduct, even if undertaken consciously, does not itself demonstrate agreement. For those reasons and in light of my discussion of the federal claims, the state antitrust claims are DISMISSED.

---

(continued from previous page)

more persons shall not restrain or monopolize trade or commerce"); Kansas Stat. Ann. § 50-101 (2008) (defining "[a] trust is a combination of capital, skill, or acts, by two or more persons"); Me. Rev. Stat. Ann. tit. 10, § 1101 (2008) (prohibiting "[e]very contract, combination in the form of trusts or otherwise, or conspiracy, in restraint of trade"); Mich. Comp. Laws § 445.772 (prohibiting "[a] contract, combination, or conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce"); Minn. Stat. § 325D.51 (2008) (prohibiting "[a] contract, combination, or conspiracy between two or more persons in unreasonable restraint of trade or commerce"); Nev. Rev. Stat. § 598A.060 (enumerating and prohibiting various types of agreements that "constitute[] a contract, combination or conspiracy in restraint of trade); N.C. Gen. Stat. § 75-1 (2008) (prohibiting "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade"); N.D. Cent. Code § 51-08.1-02 (2008) (prohibiting "[a] contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce"); S.D. Codified Laws § 37-1-3.1 (prohibiting "[a] contract, combination, or conspiracy between two or more persons in restraint of trade or commerce"); Tenn. Code Ann. § 47-25-101 (2008) (prohibiting "[a]ll arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition"); W.Va. Code § 47-18-3 (prohibiting "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce"); Wis. Stat. § 133.03 (2008) (prohibiting "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce").

2. State Consumer Protection Claims

As noted above, Count Two of the SCAC also asserts claims under the consumer protection laws of the following eight jurisdictions: California, Washington D.C., Florida, Maine, Massachusetts, Nebraska, New Mexico and North Carolina.[23] To support those claims, Plaintiffs allege the same conduct that forms the basis of their antitrust claims. (See, e.g., Pls.' Opp'n 2 ("The pertinent state consumer protection laws encompass price-fixing claims because price fixing is a form of unfair, unconscionable or deceptive conduct."); see also id. at 34 n.39.) While the statutes at issue may embrace a violation of federal antitrust laws as a grounds for relief,[24] my conclusion

---

[23] While the SCAC asserts claims broadly under the Kansas Unfair Trade and Consumer Protection Act, see Kansas Stat. Ann. ch. 50; see also SCAC ¶ 136(f), Plaintiffs clarify that they assert only claims under Article 1 of that Act, prohibiting certain restraints of trade, see id. § 50-101 et seq., and not the portion of Article 6 of that Act entitled the Kansas Consumer Protection Act, see id. § 50-623 et seq.; see also Pls.' Opp'n 33.

[24] See, e.g., Fla. Stat. § 501.203(3)(c) (2008) (Florida's consumer protection act violated by violations of "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices"); 940 Mass. Code Regs. 3.16(4) (2008) (Massachusetts consumer protection act violated by violation of the "the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes"); see also Sunbelt Television, Inc. v. Jones Intercable, Inc., 795 F. Supp. 333, 338 (C.D. Cal. 1992) ("Here, since plaintiff's have adequately plead a violation of the

(*continued on next page*)

that Plaintiffs have not adequately alleged such a violation

necessarily precludes their attempt to recast that violation as

an unfair business practice.[25]

For the reasons stated above, therefore, Count Two of the

SCAC is DISMISSED.

---

(*continued from previous page*)

Sherman Act, they have clearly stated a cause of action under California's Unfair Competition law."); Dist. Cablevision Ltd. P'ship v. Bassin, 828 A.2d 714, 723 (D.C. 2003) ("Trade practices that violate other laws, including the common law, also fall within the purview of the [Washington D.C. Consumer Protection Procedures Act]."); Mack v. Bristol-Myers Squibb Co., 673 So. 2d 100, 104 (Fla. Ct. App. 1 Dist. 1996) ("Thus, the acts proscribed by subsection 501.204(1) include antitrust violations."); Triple 7, Inc. v. Intervet, Inc., 338 F. Supp. 2d 1082, 1087 (D. Neb. 2004) (Nebraska consumer protection statute violated by violations of Sherman Act); ITCO Corp. v. Michelin Tire Corp., 722 F.2d 42, 48 (4th Cir. 1983) ("We thus hold that proof of conduct violative of the Sherman Act is proof sufficient to establish a violation of the North Carolina Unfair Trade Practices Act.").

[25] See, e.g., In re Tamoxifen Citrate Antitrust Litig., 466 F.3d 187, 198 (2d Cir. 2006) (affirming district court's dismissal of state consumer protection claims upon district court's conclusion that plaintiffs failed to state a federal antitrust claim) ; Triple 7, 338 F. Supp. 2d at 1087 ("Plaintiff has failed to state a claim under the CPA for the same reasons discussed in connection with its Sherman Antitrust Act claim."); R.J. Reynolds Tobacco Co. v. Philip Morris Inc., 199 F. Supp. 2d 362, 396 (M.D. N.C. 2002) ("Because Plaintiffs do not allege any facts that suggest that Defendant's conduct is unlawful beyond the conduct that is the basis for their failed federal claims, Plaintiffs' state common law and statutory claims fail as well."); Carter v. Variflex, Inc., 101 F. Supp. 2d 1261, 1270 (C.D. Cal. 2000) ("Thus, in light of the Court's findings under the Sherman Act, the Court finds that Variflex has failed to produce sufficient evidence to support its California unfair competition claim.").

C.    The Unjust Enrichment Count

Count Three of the SCAC alleges unjust enrichment: "The economic benefit of the overcharges and unlawful profits sought by and derived by Defendants through charging supracompetitive and artificially inflated prices for Internet Music and CDs is a direct and proximate result of Defendants' unlawful practices." (SCAC ¶ 141; see also Pls.' Opp'n 40 ("[T]he economic benefit gained by Defendants from Plaintiffs through Defendants' price-fixing and anticompetitive conduct is precisely the issue here. The proper focus is on the amounts by which Defendants were enriched." (emphasis in original)).) Having concluded above that the SCAC fails to allege a violation of the antitrust laws, Plaintiffs cannot now maintain their unjust enrichment claim predicated on the benefit accruing to Defendants as a result of that alleged violation. Therefore, Count Three of the SCAC is DISMISSED.

CONCLUSION

For the reasons stated above, Defendants' motion to dismiss the SCAC [dkt. no. 75] is GRANTED, and Plaintiffs' motion to amend SCAC Paragraph 99 [dkt. no. 104] is DENIED as futile. The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED:

DATED: New York, New York
October 9, 2008

LORETTA A. PRESKA, U.S.D.J.